**2021 IL 126291**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

———————————

(Docket No. 126291)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
TODD L. JOHNSON, Appellee.

*Opinion filed October 7, 2021.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, Michael J. Burke, and Carter concurred in the judgment and opinion.

**OPINION**

¶ 1     A Peoria County jury found defendant, Todd L. Johnson, guilty of armed robbery. The evidence at trial established, *inter alia*, that a 9-millimeter pistol and a BB pistol were discovered on the premises where he was arrested following his commission of the offense. The 9-millimeter was subsequently swabbed for DNA, but the swabs were never tested for DNA. On direct appeal, defendant argued that

trial counsel was ineffective for failing to request that the swabs be tested. A majority of the appellate court panel agreed and granted defendant a new trial. For the reasons that follow, we reverse the judgment of the appellate court and affirm defendant's conviction.

¶ 2                                                          FACTS

¶ 3        In March 2015, defendant was indicted on one count of aggravated robbery (720 ILCS 5/18-1(b)(1) (West 2014)) and one count of armed robbery (*id.* § 18-2(a)(2)). The charges stemmed from a gas station robbery that occurred on March 10, 2015, and Aaron Ferguson, the manager on duty at the time, was the named victim. The armed robbery count alleged that defendant committed the robbery while armed with a firearm, and the aggravated robbery count alleged that defendant committed the robbery while indicating that he was armed with a firearm.

¶ 4        In June 2016, the cause proceeded to a jury trial. In its opening statement, the State advised the jurors that they would be shown surveillance videos of the robbery, which included footage of defendant's flight from the gas station. The State further advised that, immediately after the robbery, two eyewitnesses had observed defendant get into a Cadillac parked on an adjacent street and drive away. When the Cadillac and defendant were later located by the police, one of the witnesses identified defendant as the man who had driven away. Defendant also attempted to flee when he was subsequently approached by the police.

¶ 5        The State informed the jurors that, during a search of the premises where defendant was located and arrested, a 9-millimeter handgun, a BB gun, and clothing matching the robber's description were found. Maintaining that its evidence would prove defendant's guilt beyond a reasonable doubt, the State asked the jury to find defendant guilty on both robbery counts.

¶ 6        In response, stating that "[l]ike anything in life, the devil is in the details," defense counsel urged the jurors to pay close attention to the evidence that would be presented for their consideration. Counsel encouraged the jurors to examine the 9-millimeter pistol and determine for themselves whether it matched the handgun seen in the surveillance videos. Suggesting that defendant had been wrongly identified, counsel asked the jury to consider whether there was "any forensic

evidence, any DNA, fingerprints, footprints, anything scientifically linking [defendant] to a crime." Counsel reminded the jurors that defendant was presumed innocent and asked that they hold the State to its burden of proving defendant's guilt beyond a reasonable doubt.

¶ 7        Ferguson testified that on the morning of March 10, 2015, he was working at the Marathon gas station on West Forrest Hill Avenue in Peoria after opening the station for business at 6 a.m. At approximately 8 a.m., when no customers were present, a man in a dark ski mask brandishing a black handgun entered the store, placed a black satchel-type bag on the checkout counter, and demanded money. In response, Ferguson opened the store's cash register and placed its cash into the bag. The man with the gun then walked behind the counter, where he and Ferguson briefly struggled before the man grabbed the bag and fled.

¶ 8        During the struggle, the robber repeatedly struck Ferguson in the head with the barrel end of the gun that he was carrying. Ferguson activated a silent alarm during the struggle and immediately called the police after the robber fled. Ferguson estimated that the man with the gun was at least six feet tall and weighed approximately 200 pounds. Ferguson also estimated that less than $100 was stolen from the station's cash register. When cross-examined, Ferguson acknowledged that his head had been scraped when he was hit by the robber's gun.

¶ 9        The gas station's surveillance system recorded the robbery, and videos of the incident were shown at trial. The videos depict the robber as a black male wearing black gloves, a white zippered jacket over a white hoodie, and a black balaclava-looking ski mask covering most of his face. A video taken by an exterior camera shows the man exiting the store with the black bag and then jogging toward West Forrest Hill Avenue before turning in the direction of Wilson Drive.

¶ 10        Earl Hensley testified that on the morning of March 10, 2015, he was part of a work crew that had been repairing a home on Wilson Drive, "a block from the Marathon gas station." While arriving at the home that morning, Hensley noticed an unoccupied white Cadillac coupe parked down the street with its engine running. Hensley testified that he had not seen the Cadillac on the street in the preceding days and that the car's rear driver's side window was broken and covered with plastic. Hensley explained that, while subsequently sitting in his van waiting for his coworkers to arrive, he saw a man run around the corner of West Forrest Hill

Avenue from the direction of the Marathon station. The man passed Hensley's van while running through front yards on Wilson Drive and then entered the Cadillac and drove away. Hensley testified that the man was wearing a hooded jacket and a stocking cap and had long braids or dreadlocks. Hensley further testified that the man was holding his left arm close to his stomach, "as if he was holding something."

¶ 11     Hensley testified that he had a "police scanner app" on his cellphone and that, minutes after the Cadillac drove away, the app indicated that a robbery had just occurred. Hensley subsequently heard police sirens and reported what he had seen to a responding officer. Shortly thereafter, Hensley was contacted by an investigator, who drove him to a house on New York Avenue. There, Hensley identified defendant's Cadillac as the one he had seen, and he identified defendant as the man he had seen. At trial, Hensley also identified defendant as the man he had seen.

¶ 12     When cross-examined, Hensley acknowledged that, when he saw defendant on Wilson Drive, defendant was neither carrying a weapon nor committing a crime. Hensley further acknowledged that he had not seen defendant leave the Marathon station. Hensley agreed that defendant had not sped off "excessively fast" when driving away.

¶ 13     Fred May testified that he lived on Wilson Drive and that on the morning of March 10, 2015, he noticed a white Cadillac parked across the street from his house. May stated that the car's lights were on and that the rear driver-side window was broken and covered with cardboard. May testified that he subsequently saw a man run to the Cadillac from West Forrest Hill Avenue. May testified that the man ran through the front yards on Wilson Drive, got into the Cadillac, and "took off" toward Interstate 74. May indicated that the man was a tall black man with long braids or dreadlocks, wearing a white jacket. May further indicated that the man looked back as he ran and "had his right hand or his left arm up against his chest or belly." May acknowledged that he had not seen the man's face.

¶ 14     When cross-examined, May again acknowledged that he had not seen the man's face. May further acknowledged that he had not seen the man carrying anything or doing anything illegal.

- 4 -

¶ 15        Detective Craig Williams of the Peoria Police Department testified that, after being dispatched to the robbery at the Marathon station, he and Detective Richard Linthicum began searching for the suspect Cadillac. "Within 30 minutes," the detectives found the car parked in the alley behind the house at 1810 New York Avenue. Consistent with May's description of the vehicle, the driver's side rear window was covered with cardboard. Williams testified that, while he and Linthicum were subsequently surveilling the house from a nearby street, he observed defendant walk from the house, remove something black from the Cadillac, walk toward the detached garage, and then walk back to the house. Williams testified that Detective Steven Garner subsequently arrived at the scene with Hensley. When Garner went to the front of the house after Hensley identified defendant, defendant "took off running down the alley" but was quickly apprehended.

¶ 16        When cross-examined, Williams acknowledged that Garner and Hensley had arrived at the house in an unmarked police car. Williams further acknowledged that Garner was a large man and had been wearing plain clothes when he approached defendant outside the house. Williams agreed that the 1800 block of New York Avenue was a "pretty high crime area." Williams testified that he had not seen defendant with a gun and had not seen him do anything illegal.

¶ 17        Linthicum testified that defendant entered the detached garage with what appeared to be a black bag and that he stayed in the garage a short time before exiting and entering the house. Linthicum testified that, after defendant entered the house, a minivan pulled up and parked in the alley. When defendant subsequently exited the house, Hensley identified him, and Garner attempted to make contact with him. Defendant fled in response, but Linthicum caught and arrested him with Williams's assistance.

¶ 18        When cross-examined, Linthicum acknowledged that Garner and Hensley had arrived at the house in an unmarked police car and that neither had been wearing police uniforms. Linthicum agreed that the house was located in a fairly "dangerous area" of Peoria. Linthicum acknowledged that defendant was not armed with a gun when he was arrested.

¶ 19        Detective Brian Terry testified that he secured the residence at 1810 New York Avenue while a search warrant was obtained. Terry testified that he participated in

the subsequent search of the home and spoke with resident Angel Patterson. Patterson directed Terry to her bedroom, where a black handgun later identified as a 9-millimeter Hi-Point was found in a box in the bottom drawer of her dresser. Terry then searched the garage, where he found a second handgun on a board that had been placed across the rafters.

¶ 20 When cross-examined, Terry acknowledged that the handgun found in the garage was a broken BB gun. He further acknowledged that Patterson had been cooperative during the search of her home and that the boxed 9-millimeter pistol found in her dresser had been hidden under folded clothes. Terry testified that a black bag had not been found in the garage.

¶ 21 Officer Paul Tuttle testified that he photographed the scene at 1810 New York Avenue and processed the items of evidence that were discovered during the search. Tuttle testified that a white hoodie and a black ski mask were found in an upstairs bedroom of the house. Tuttle identified the 9-millimeter pistol that was found in Patterson's dresser and stated that, although he "did not notice anything on the gun that is not normally there," he swabbed the handle and slide for "potential DNA." Tuttle also identified the broken BB gun that was found in the garage.

¶ 22 When cross-examined, Tuttle agreed that the BB gun's slide was missing and that it had black tape around its handle and a "spring sticking out." Tuttle also agreed that the 9-millimeter handgun found in the dresser was "solid black on both sides." When asked if he had found any DNA, blood, or skin deposits on the 9-millimeter, Tuttle explained that he had not seen anything but had swabbed the gun because he was aware that Ferguson had been struck in the head with a gun. Tuttle indicated that he had also seen the resulting bruises on Ferguson's face.

¶ 23 When asked if the swabs taken from the gun had been tested for DNA, Tuttle testified that they had not been tested because no testing had been requested. Tuttle acknowledged that the white hoodie found in the house was extremely dirty and had not been tested for DNA, either. Tuttle explained that he had not attempted to recover fingerprints from the 9-millimeter pistol because he had never been able to lift prints from a Hi-Point handgun due to the nature of the pistol's surface. Tuttle conceded that there was no forensic evidence linking defendant to the hoodie or the 9-millimeter and that there was no forensic evidence linking the 9-millimeter to any reported crime. Tuttle agreed that the searches conducted at 1810 New York

Avenue did not lead to the discovery of a black bag or a white zippered jacket. He further agreed that the ski mask found during the search of the house had a zippered face portion and was a frayed and torn sock-hat type of mask as opposed to a balaclava.

¶ 24 Using certified copies of records obtained from the Secretary of State, the State established that the suspect Cadillac was registered to defendant. The State's exhibits, which included an aerial photograph of the Marathon station and its surrounding streets, were admitted without objection. After the State rested, defendant made a motion for a directed finding, which the trial court denied.

¶ 25 For the defense, Officer Paul Burns of the Peoria County jail testified that he booked defendant into the jail on March 10, 2015, and that defendant was six feet, one inch and weighed 273 pounds at the time. Burns identified defendant's intake photograph and agreed that defendant had "long dreads."

¶ 26 Alesha List testified that she was employed by defense counsel's law office and had extracted a series of photographs from the Marathon station's surveillance videos. Several of the photos were admitted as defense exhibits without objection, and one shows a front view of the robber holding a black pistol. Consistent with List's description of the photo, the robber's hoodie is "clean white," and an area of "silver or gray" is visible near the ejection port of the gun.

¶ 27 Angela Patterson testified that on March 10, 2015, she lived at 1810 New York Avenue with defendant and her four children. Patterson explained that she had cooperated with the police who searched her home that day and had led them to the 9-millimeter pistol that she kept in her dresser drawer. Patterson testified that she legally owned the weapon and that, to her knowledge, no one else knew where she kept it.

¶ 28 In its closing argument to the jury, the State maintained that, after robbing the Marathon station with a firearm, defendant ran to his Cadillac on Wilson Avenue and then drove home to New York Avenue. The State argued that defendant had strategically parked his car near the interstate. The State emphasized that Hensley and May had both seen defendant run to the Cadillac moments before Hensley's scanner app advised that a robbery had just occurred. The State further emphasized that the Cadillac had distinguishing characteristics, that Hensley had identified

defendant and the car after both were located on New York Avenue, and that defendant had fled when approached by the investigators outside the house. The State noted, that although the stolen money and the black bag were never found, the police discovered a white hoodie, a black ski mask, a gun, and a BB gun during the execution of the search warrant. The State argued that the jury did not need "every single piece of the puzzle" to find defendant guilty. The State suggested that, but for defendant's distinct car, he might not have been apprehended.

¶ 29        When discussing the jury instructions regarding the elements of the charged offenses, the State argued that defendant was guilty of both armed robbery and aggravated robbery based on his use of Patterson's pistol. The State effectively conceded, however, that if the jury concluded that the BB gun had been used, then defendant was only guilty of aggravated robbery.

¶ 30        In response, defense counsel contended that while the prosecution presented an "interesting theory," the only thing that had arguably been proven beyond a reasonable doubt was that defendant owned a beat-up Cadillac. Counsel argued that "the devil is in the details" and that the State's "puzzle" had missing and unfitting pieces. Emphasizing that the robber Ferguson described weighed at least 80 pounds less than defendant and that Hensley acknowledged that he had not seen defendant commit any crime, counsel argued that the State's own witnesses exculpated defendant.

¶ 31        Encouraging the jurors to again watch the surveillance videos of the robbery, counsel argued that the hoodie and ski mask that the perpetrator wore did not match the hoodie and mask that were later found by the police. Counsel additionally argued that neither of the handguns that were found matched the robber's gun. Counsel observed that the broken BB gun was clearly not the gun that was used and that, unlike Patterson's 9-millimeter, the pistol in the videos had a discernible gray or silver area. Counsel suggested that such details were critical when assessing whether the State had proven its case beyond a reasonable doubt.

¶ 32        Emphasizing that there was no forensic evidence linking defendant to the crime, counsel criticized the investigators for failing to have the swabs from the 9-millimeter tested for DNA. Counsel argued that the State's evidence regarding the 9-millimeter actually proved defendant's innocence, given that the police recovered the wrong firearm and "didn't do any testing of it." Counsel also noted that

Patterson's testimony that she alone knew of the gun's location was unimpeached. Arguing that defendant did not commit the robbery in question, counsel urged the jury to find that the State had failed to meet its burden of proving defendant's guilt beyond a reasonable doubt.

¶ 33    In rebuttal, the State argued that, although the videos of the robbery were not "HD quality," they nevertheless showed defendant robbing the Marathon station and hitting Ferguson in the head with Patterson's gun. With respect to the still photograph depicting an area of silver or gray near the gun's ejection port, the State suggested that the color variance was "a trick of the light" hitting the surface of the weapon. Referencing the video from which the picture was extracted, the State encouraged the jurors to "look at the whole thing and see how that gun looks in that video." Noting that defendant was a very large man, the State suggested that Ferguson had obviously underestimated defendant's weight.

¶ 34    With respect to the lack of forensic evidence linking defendant to the crime, the State argued that the absence of such evidence did not negate the testimony of its eyewitnesses. The State also referenced Tuttle's testimony that there was no observable biological material on Patterson's gun. Urging the jury to find defendant guilty as charged, the State maintained that it had proven defendant's guilt beyond a reasonable doubt and that defendant's Cadillac corroborated the entire case.

¶ 35    The record indicates that the jury retired to deliberate at approximately 3:20 p.m. and that immediately thereafter it requested access to the surveillance videos. The jury was subsequently provided with all the admitted exhibits, including Patterson's 9-millimeter pistol. Thereafter, the jury sent the trial court a note asking, "Why wasn't anything tested for DNA?" After conferring with the parties, the court advised the jury that the evidence that it was to consider was the evidence adduced at trial. Noting that it was nearing 5 p.m., the court also inquired whether dinner arrangements for the jury needed to be made. In response, the jury indicated that it wanted to continue its deliberations the following morning. After conferring with the parties, the court excused the jurors for the day.

¶ 36    The following morning, after the jurors returned to the jury room to resume their deliberations, counsel advised the court that defendant was requesting that the proceedings be suspended so that DNA testing could be performed on the swabs taken from Patterson's 9-millimeter pistol. Counsel stated that he told defendant

that he would relay the request but that it was somewhat impracticable given the time it would take to obtain the results.

¶ 37 The trial court denied defendant's request as untimely, noting that, even assuming that the swabs contained DNA suitable for testing, the results of any testing could take months to receive. When the court further noted that a request to have the swabs tested could have been made much sooner, counsel indicated that he "was under the impression that there was no DNA sample, and not that it was a DNA sample that wasn't tested." Counsel indicated that he was thus surprised by Tuttle's testimony that swabs had been taken but not tested. Counsel noted that, after Tuttle stated that testing of the swabs had not been requested, "it was left at that" and "it just sat there."

¶ 38 In response to counsel's assertion that Tuttle's testimony had come as a surprise, the State advised that its discovery had disclosed that, although there was no indication that any biological material was present on Patterson's gun, it had nevertheless been swabbed for DNA. The State added that referring to the swabs as DNA samples was not "necessarily correct."

¶ 39 The trial court observed that, given that the relevant information regarding the swabs had been disclosed in discovery, the fact that the swabs had not been tested "was either not noticed by the defense or it was and they chose to not go down that route." The court then granted counsel's request for a recess so that he and defendant could discuss the matter. When the parties returned to the courtroom, counsel withdrew the request to suspend the proceedings, indicating that he had explained to defendant that it was too late to reopen the proofs.

¶ 40 The jury subsequently sent the trial court a second note, which asked whether defendant was right-handed or left-handed. After conferring with the parties, the court again advised the jury that the evidence that it was to consider was the evidence adduced at trial. Thereafter, the jury returned its verdict finding defendant guilty of aggravated robbery and armed robbery. When discharging the jurors, the trial court expressed its appreciation for "the attention [they] paid to the evidence."

¶ 41 In October 2016, defendant filed a motion for a new trial or to set aside the guilty verdict and an amended motion for a new trial or to set aside the guilty verdict. Prior thereto, defendant sent three letters to the trial court, requesting that

the swabs from the 9-millimeter be tested for DNA. Defendant's amended motion raised numerous claims, one of which was that the State's failure to have the swabs from the 9-millimeter tested for DNA violated the "*Brady* Rule" (*Brady v. Maryland*, 373 U.S. 83 (1963)). The amended motion also suggested that the jury's note regarding the lack of DNA evidence was an indication that the jury had entertained doubts as to defendant's guilt. But see *People v. Wilmington*, 2013 IL 112938, ¶¶ 22, 35 (rejecting the defendant's claim that the jury's notes regarding evidentiary matters, in and of themselves, suggested that the evidence of guilt was closely balanced).

¶ 42    At the hearing on defendant's amended motion, counsel argued, *inter alia*, that Patterson's 9-millimeter pistol did not match the gun seen in the surveillance videos. Counsel argued that the hoodie and ski mask found in Patterson's house did not match the ones seen in videos, either. Counsel further emphasized that the police had not recovered the robber's black gloves, black bag, or white jacket. With respect to the untested swabs, counsel again indicated that he had "discovered at trial that DNA exemplars were taken, just never tested." At the same time, counsel acknowledged that, if DNA had been discovered and tested, the results of the tests "could have been inculpatory or exculpatory." Counsel further acknowledged that, like fingerprints, DNA can be "wiped off." Counsel argued, however, that if testing revealed the presence of DNA originating from someone other than Ferguson, then the results would be significantly exculpatory and would further prove that the gun in the videos was not Patterson's. Counsel also suggested that the State's failure to have the swabs tested was akin to a *Brady* violation, given that they might have contained potentially exculpatory evidence.

¶ 43    In response, the State reiterated that, because the swabs taken from the 9-millimeter had not been tested for the presence of DNA, it could not be said that there was "DNA recovered and not tested." The State noted that the jury was aware that the swabs had not been tested and that during its deliberations "the jury had a question about it." The State argued, however, that defendant was attempting to relitigate the trial on selected pieces of evidence and that defendant's assertions regarding the potential significance of the swabs ignored the strength of Hensley's and May's eyewitness testimony. The State further argued that it was impossible to fairly compare and contrast Patterson's gun with the gun in the surveillance videos given "where the angles are and where it was seen."

¶ 44　　When denying defendant's amended motion for a new trial or to set aside the guilty verdict, the trial court observed that the apparent discrepancies between the ski mask, hoodie, and gun from the videos and those found at the house were not necessarily significant given the lapse of time between the robbery and defendant's arrest. The court noted that the situation would be different had the police followed defendant in the Cadillac when he left the scene and detained him as soon as he exited the car. The court further noted that, although testing for DNA is not "an automatic thing on every crime," jurors generally presume the contrary "due to television." The court concluded that, although some questions remained unanswered, the State had presented a strong circumstantial case that gave the jury a "clear picture of how things happened." See *People v. Campbell*, 146 Ill. 2d 363, 379-80 (1992) (noting that where the prosecution's case is based entirely on circumstantial evidence, the jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances if the totality of the evidence is otherwise sufficient to prove the defendant's guilt beyond a reasonable doubt). The court noted, *inter alia*, that defendant's distinct Cadillac was particularly "damning" and that defendant had the stature of a professional football player and was "fairly unique looking." The court also observed that defendant had attempted to flee when he was approached by the police outside the house. See *id.* at 388 ("While flight by itself is not sufficient to establish guilt, it may be a circumstance to be considered with other factors tending to establish guilt."). Opining that the jury had taken its job very seriously, the court noted its agreement with the jury's verdict, and the cause proceeded to sentencing.

¶ 45　　In his statement of allocution, defendant maintained his innocence and asserted that DNA testing of the swabs taken from Patterson's 9-millimeter pistol would reveal the truth. After the trial court again stated its agreement with the jury's verdict, defendant suggested that the jury's question regarding the lack of DNA evidence indicated that the jurors had entertained a reasonable doubt as to his guilt. Stating that he could explain why he was in the vicinity of the robbery on the morning in question, defendant asked that the trial court have the swabs tested so that the truth could be revealed. Defendant emphasized, *inter alia*, that the police never recovered the stolen money, the black bag, or the pants and shoes the robber had worn. Defendant suggested that it was odd that a robber who apparently had enough time to throw things away had only thrown specific items away.

- 12 -

¶ 46    In response to defendant's assertions with respect to the physical evidence, the trial court again noted that the situation would be different had the police followed defendant in the Cadillac when he left the scene and detained him as soon as he exited the car. The court observed that, given the lapse of time between the robbery and defendant's arrest, "there was enough time to throw things away" and that hypothetically "there could have been 14 guns involved."

¶ 47    The trial court ultimately merged defendant's convictions and sentenced him to serve a 33-year term of imprisonment on the armed robbery count. The trial court noted that defendant had five prior felony convictions, that he would be eligible for day-for-day credit toward his sentence, and that a 33-year sentence was the midpoint of the applicable range of 21 to 45 years (see 720 ILCS 5/18-2(a)(2), (b) (West 2014)).

¶ 48    On direct appeal from his conviction, defendant argued that trial counsel was ineffective for failing to have the swabs taken from Patterson's 9-millimeter pistol tested for DNA. Defendant asserted that counsel's performance was deficient because counsel had acted under the mistaken belief that the gun had not been swabbed for DNA and that there was a reasonable probability that, had the swabs been tested, the outcome of the trial would have been different.

¶ 49    The appellate majority agreed with defendant, vacated his conviction, and remanded for a new trial. 2020 IL App (3d) 160675, ¶ 42. The majority concluded that the record rebutted the presumption that counsel's decision to not seek DNA testing of the swabs was a matter of trial strategy and that defendant was prejudiced by the decision because "a negative DNA test would likely have resulted in, at the very least, an acquittal on the armed robbery charge." *Id.* The majority reasoned that, if Ferguson's DNA was not found on Patterson's 9-millimeter, "it would tend to cast doubt that defendant was the perpetrator of the robbery" and that, "[e]ven if the jury could still conclude that defendant was the perpetrator, the lack of Ferguson's DNA on the firearm would severely undermine the notion that defendant carried the firearm, rather than the BB gun, during the robbery." *Id.* ¶ 40. Acknowledging that "[i]n the strictest sense" defendant could only establish prejudice by showing that Ferguson's DNA would not have been found on the swabs, the majority held that, because defendant was claiming that counsel was ineffective for failing to request DNA testing, "it would be paradoxical to require

that the defendant present the results of those tests to support his claim of prejudice." *Id.* ¶ 41. The majority thus held that "a defendant need only demonstrate that a negative DNA test result would probably change the outcome of the trial in order to establish prejudice in this context." *Id.*

¶ 50        The dissent argued that the majority had "created a new prejudice test to be applied in situations like these" and that the new test allowed a defendant "to assume, for the purposes of establishing ineffective assistance, that any DNA tests will come out in his favor." *Id.* ¶ 54 (Schmidt, J., dissenting). The dissent further argued that, because no DNA testing had been performed on the swabs taken from Patterson's 9-millimeter pistol, defendant was unable to establish prejudice. *Id.* ¶ 52. The dissent noted that in *People v. Scott*, 2011 IL App (1st) 100122, the appellate court decided "this precise issue" when holding that, in the absence of DNA test results favorable to a defendant's case, any claim that there is a reasonable probability that the results might have changed the outcome of the defendant's trial would be speculative and insufficient to sustain an ineffective-assistance-of-counsel claim. 2020 IL App (3d) 160675, ¶ 53. We subsequently granted the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019); R. 604(a)(2) (eff. July 1, 2017).

¶ 51                                          ANALYSIS

¶ 52        A criminal defendant is guaranteed the right to the effective assistance of counsel by both the United States and Illinois Constitutions. U.S. Const., amend. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims that counsel provided ineffective assistance are evaluated under the familiar two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which this court adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984). To prevail on an ineffective-assistance-of-counsel claim, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that counsel's deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88; *People v. Jackson*, 2020 IL 124112, ¶ 90. To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Although the performance and prejudice components of an ineffectiveness inquiry present mixed questions of

law and fact (*id.* at 698), our standard of review for determining whether a defendant was denied the effective assistance of counsel is ultimately *de novo* (*People v. Hale*, 2013 IL 113140, ¶ 15).

¶ 53 "Surmounting *Strickland*'s high bar is never an easy task" (*Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)), and a defendant's failure to make the required showing of either deficient performance or sufficient prejudice will defeat a claim that counsel was ineffective (*Strickland*, 466 U.S. at 700; see also *People v. Enis*, 194 Ill. 2d 361, 377 (2000) ("The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel.")). As a result, if it is easier to dispose of an ineffective-assistance claim on the ground that it lacks a showing of sufficient prejudice, a court may proceed directly to *Strickland*'s prejudice prong and need not determine whether counsel's performance was deficient. *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 54 With respect to *Strickland*'s prejudice prong, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. "Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial." *Id.* at 693. "In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Id.* A reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Where, as here, a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt. *Id.* at 695.

¶ 55 *Strickland* requires a defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Id.* at 693. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*,

2014 IL 115102, ¶ 81; see also *People v. Palmer*, 162 Ill. 2d 465, 481 (1994) (proof of prejudice cannot be based on "mere conjecture or speculation").

¶ 56 Before this court, the parties dispute whether defendant is able to satisfy either prong of *Strickland*. Defendant correctly notes, however, that in the appellate court and in its petition for leave to appeal, the State did not argue that counsel's performance was not deficient; it contended only that defendant was unable to demonstrate resulting prejudice. In its petition for leave to appeal, the State conceded, in fact, that "counsel's mistaken belief that DNA swabs were unavailable for testing constituted deficient performance given the contrary record evidence." We thus find that the State has forfeited its present claim that defendant is unable to demonstrate that counsel's performance was deficient. See, *e.g.*, *People v. Dorsey*, 2021 IL 123010, ¶ 70; *People v. Robinson*, 223 Ill. 2d 165, 173-74 (2006). Moreover, because we conclude that defendant is unable to establish that, but for counsel's failure to have the swabs tested, there is a reasonable probability that the outcome of the trial would have been different, we need not consider whether defendant can satisfy *Strickland*'s performance prong. *Givens*, 237 Ill. 2d at 331.

¶ 57 In *Scott*, 2011 IL App (1st) 100122, ¶¶ 1, 15-17, after the defendant's first degree murder conviction was affirmed on direct appeal, he filed a postconviction petition alleging that his trial attorney was ineffective for failing to pursue DNA testing of a shirt that the defendant purportedly wore during the commission of the offense. The defendant maintained that DNA testing might have resulted in potentially exculpatory and highly relevant evidence because the absence of his DNA on the shirt, coupled with the presence of someone else's, would have suggested that the defendant had been wrongly identified by the State's eyewitnesses. *Id.* ¶ 30. When rejecting the defendant's ineffective-assistance claim, the appellate court concluded that the defendant could not establish prejudice under *Strickland* because any arguments regarding the potential results of the unperformed testing were entirely speculative. *Id.* ¶ 31. The court noted that it was not known whether the shirt contained DNA sufficient for testing, "let alone whether the results would be exculpatory." *Id.* "Without test results," the court explained, it could not determine whether there was a reasonable probability that the result of the defendant's trial would have been different had testing been pursued. *Id.* The court further noted that any opinion that could be made with

respect to prejudice would be advisory because there was no exculpatory evidence to consider. *Id.*

¶ 58    Here, the dissent rightly relied on *Scott* when concluding that defendant was unable to demonstrate prejudice for purposes of *Strickland*. See 2020 IL App (3d) 160675, ¶ 53 (Schmidt, J., dissenting). Although Patterson's pistol was swabbed for potential DNA, it is unknown whether the swabs contain DNA sufficient for testing, let alone whether the results would be exculpatory. Furthermore, because there is no exculpatory evidence for us to consider, any opinion that could be made with respect to prejudice would be advisory. Defendant argues that *Scott*'s rationale should be limited to its facts, but its pertinent holding was not factually dependent. It was rather a practical application of the well-established rule that prejudice under *Strickland* cannot be based on "mere conjecture or speculation." *Palmer*, 162 Ill. 2d at 481; see also *Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (speculation as to what an expert witness would say is insufficient to establish prejudice); *People v. Dupree*, 2018 IL 122307, ¶¶ 34-40 (explaining that a defendant cannot prevail on a claim that counsel was ineffective for failing to investigate witnesses without sufficient evidence that the witnesses would have provided testimony favorable to the defense); *People v. Olinger*, 176 Ill. 2d 326, 363 (1997) (rejecting the defendant's claim that counsel was ineffective for failing to pursue a strategy based on unidentified fingerprints found at the crime scene where his claim that the prints might have exonerated him was "pure speculation" falling "far short of the demonstration of actual prejudice required by *Strickland*"); *People v. Thompson*, 2020 COA 117, ¶ 55 (rejecting the defendant's claim that counsel's failure to request additional DNA testing resulted in prejudice as "inherently speculative" given that the additional testing had not been performed). As the dissent rightly observed, the appellate majority in the present case essentially created a new test, which in contravention of *Strickland* "allows a defendant to assume, for the purposes of establishing ineffective assistance, that any DNA tests will come out in his favor." 2020 IL App (3d) 160675, ¶ 54 (Schmidt, J., dissenting).

¶ 59                                  CONCLUSION

¶ 60          For the foregoing reasons, we affirm the trial court's entry of judgment on defendant's armed robbery conviction and reverse the appellate court's judgment granting him a new trial.

¶ 61          Appellate court judgment reversed.

¶ 62          Circuit court judgment affirmed.