2024 IL App (2d) 230036-U
No. 2-23-0036
Order filed February 27, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) | No. 17-CF-156 |
| | ) | |
| ANGEL GALLEGOS-ORTIZ, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Kennedy and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*:  During defendant's trial on child sex offenses, defense counsel was not ineffective for failing to seek reconsideration of the trial court's pretrial ruling excluding the victim's statement to investigators about prior sexual abuse by another person, where, contrary to defendant's argument, the statement did not contradict the testimony of the victim's mother as to who babysat the victim while the mother was at work.

¶ 2    Defendant, Angel Gallegos-Ortiz, appeals from the judgment of the Kendall County circuit court finding him guilty of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2012)) and one count of aggravated criminal sexual abuse (720 ILCS 5/11-1.60(c)(1)(i) (West 2012)). He contends that his trial counsel was ineffective for failing to seek

admission, at trial, of the victim's out-of-court statement about an incident of sexual abuse by someone other than defendant, to show that the victim was fabricating her testimony about defendant's conduct. Because defendant did not suffer any prejudice from counsel's alleged deficient performance, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The State originally charged defendant in Kane County with several counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse, all involving nine-year-old N.T. After it was discovered that the events underlying the charges in counts IV, V, and VII occurred in Kendall County, those counts were transferred to Kendall County. Defendant was subsequently found guilty in Kane County of predatory criminal sexual assault of a child, and this court affirmed his convictions. See *People v. Gallegos-Ortiz*, 2020 IL App (2d) 170739-U, ¶¶ 2, 10, 19.

¶ 5     After the transfer of the three counts, the State indicted defendant in Kendall County on two counts of predatory criminal sexual assault of a child and one count of aggravated criminal sexual abuse, all involving N.T.

¶ 6     The State filed a pretrial motion *in limine* to exclude prior sexual activity or reputation evidence, pursuant to the rape-shield statute, *i.e.*, section 115-7(a) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7(a) (West 2016)). Specifically, the State sought to bar admission of N.T.'s statement to an investigator during an interview at the Kane County Child Advocacy Center in which she reported that, several years before her mother met defendant, she was sexually abused by someone she referred to as "grandpa." N.T. told the investigator that "grandma" and "grandpa" had been babysitting her while her mother was working. N.T. reported that, on one occasion, "grandpa" touched her butt with his penis. She could not remember

"grandma's" or "grandpa's" name. In opposing the State's motion, defense counsel argued that the statement about "grandpa" should be admitted because evidence that N.T. was previously sexually abused would show that she had prior knowledge of sexual conduct and, thus, could have fabricated the allegations against defendant. The trial court granted the State's motion and excluded the statement.

¶ 7    The following facts were established at defendant's bench trial. On April 28, 2015, Jennifer DiNicola, a registered nurse in the emergency room at Mercy Medical Center in Aurora (Mercy), treated N.T., a nine-year-old female. According to DiNicola, N.T. reported having pain when going "[n]umber 2." N.T. said that she had such pain before. N.T. told DiNicola that the pain was because her mother's boyfriend had "put his private parts in her behind" a few days earlier. No sexual assault exam was conducted at Mercy because there was no pediatric nurse on duty. Therefore, N.T. was transferred to a hospital that had a pediatric unit.

¶ 8    On cross-examination, DiNicola testified that N.T. never said where the incident occurred. When DiNicola examined N.T., she discovered an external hemorrhoid, which was not normal for someone of N.T.'s age. DiNicola did not observe any other abnormal findings indicating a sexual assault.

¶ 9    Gloria S., N.T.'s mother, testified that N.T. was born on July 1, 2005. Gloria lived with N.T., N.T.'s younger sister, and Gloria's then-boyfriend, defendant, at several locations over about four years: Roth Road in Oswego, Matthew Drive in Montgomery, Exposition Avenue in Aurora, and Blackhawk Street, also in Aurora. Gloria worked as a housecleaner during the time she lived with defendant. According to Gloria, while she, defendant, and her children lived on Matthew Drive, Exposition Avenue, and Blackhawk Street, defendant watched the children while she worked. On cross-examination, Gloria had the following exchange with defense counsel:

"Q. [The State] asked you some questions about who would watch the girls while you were at work, remember those questions?

A. Yes.

Q. You said [defendant] would watch the girls, correct?

A. Yes.

Q. [Defendant] wasn't the only one watching the girls, correct?

A. Yeah, sometimes my sister.

Q. Your sister would watch the girls, correct?

A. Yes.

Q. At some point[,] friends of your sister, Mary and George, would watch the girls?

A. I don't know who Mary and George are.

Q. Your sister was the only one that ever watched the girls while you were working?

A. Yes.

Q. How many sisters do you have?

A. Nine.

Q. Nine sisters?

A. Yes.

Q. How many of those sisters would watch the girls?

A. Two."

¶ 10    According to Gloria, on April 28, 2015, after speaking with N.T., she took N.T. to Mercy. Gloria also took an orange pair of N.T.'s underwear from the laundry. She gave the underwear to a police detective.

¶ 11    The parties stipulated that forensic testing showed a semen stain in the rear crotch area of N.T.'s orange underwear. The semen matched defendant's DNA.

¶ 12    N.T., who was 17 years old at the time of the trial, testified that defendant lived with her, her mother, and her younger sister at her aunt's farm near Oswego, on Matthew Drive in Montgomery, and on Exposition Avenue and Blackhawk Street in Aurora.

¶ 13    N.T. described two incidents on Matthew Drive when she was nine. In the first incident, she and defendant were in his bedroom when he removed her pants and underwear. He touched her breasts and rubbed his penis against her vagina. He did not put his penis inside her vagina. In the second incident, which occurred in the bathroom, defendant removed N.T.'s clothing. He touched her breasts with his hands and touched her vagina with his penis. According to N.T., nothing came out of his penis, but she did not know if he had an erection. She did not know what an erection was when she was nine years old. Also, during the second incident, defendant rubbed his penis against N.T.'s anus while touching her breasts.

¶ 14    N.T. also testified to an incident while they lived on Exposition Avenue. Defendant came into her bedroom and told her to get into bed. He then put his penis in her vagina and touched her anus with his penis.

¶ 15    On another occasion, when they lived on Blackhawk Street, N.T. and defendant were in the living room when he removed her pants. He had N.T. stroke his penis. He also touched her vagina with his penis. According to N.T., she was wearing orange underwear and felt something like water come out of defendant's penis while it was against her "butt." (N.T. initially denied that defendant placed his penis "inside [her] butt," but she later seemed to acknowledge that he did so.) After the Blackhawk Street incident, N.T. first told her mother about defendant's inappropriate conduct. N.T. believed they went to Mercy the same day as the incident.

¶ 16    At the close of the State's case-in-chief, defendant restated his objection to the trial court's pretrial ruling on the State's motion *in limine*. As an offer of proof, defense counsel stated that, "as previously argued," N.T. had disclosed that someone called "grandpa" had abused her before defendant's alleged abuse. Counsel claimed that, because N.T. "did not disclose, could not remember[,] the time, the day, or the specific location of that abuse," counsel could offer no details about N.T.'s allegation other than that "grandpa" touched N.T.'s butt.

¶ 17    Defendant testified that he would occasionally babysit N.T. when they lived together on Matthew Drive. Others sometimes babysat N.T. Defendant denied ever putting his penis on or in N.T.'s vagina or anus. He also denied ever touching N.T.'s breasts for sexual gratification.

¶ 18    On cross-examination, defendant claimed that his semen was on N.T.'s underwear because, as Gloria had told him, she put it there to trap him because he had been unfaithful. Defendant admitted that he had never told this story to anyone before trial, including his attorneys.

¶ 19    The trial court found defendant guilty on all three counts. In doing so, the court found that both N.T. and Gloria testified credibly. The court also found "somewhat incredulous" defendant's testimony that Gloria admitted to putting his semen on N.T.'s underwear to trap him.

¶ 20    Defendant filed a motion for a new trial, asserting, among other things, that the trial court erred in granting the State's motion *in limine*. Defendant did not specify how the court erred. At the hearing on the motion for a new trial, defense counsel merely adopted the assertions in the written motion. The court denied the motion.

¶ 21    The trial court sentenced defendant to eight years in prison on both of the predatory criminal sexual assault convictions, to be served consecutively to each other and to his sentences in the Kane County case. The court sentenced defendant to five years on the aggravated criminal

sexual abuse conviction, to be served concurrently with the other two sentences in this case and the sentences in the Kane County case. Defendant, in turn, filed this timely appeal.

¶ 22                                    II. ANALYSIS

¶ 23    Defendant contends that his trial counsel was ineffective during trial for failing to seek reconsideration, in light of Gloria's testimony, of the pretrial ruling barring the admission of N.T.'s statement that "grandpa" had sexually abused her while babysitting. Specifically, defendant asserts that Gloria's testimony that she did not know "Mary" or "George" and that only her sisters and defendant had babysat N.T. would have shown that N.T.'s allegation that "grandpa" had abused her while babysitting her was false, thus strongly suggesting that N.T. also fabricated her claims against defendant.

¶ 24    Claims that counsel provided ineffective assistance are evaluated under the familiar *Strickland* two-pronged standard. *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that the deficient performance resulted in prejudice. *Strickland*, 466 U.S. at 687-88; *People v. Johnson*, 2021 IL 126291, ¶ 52.

¶ 25    "To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Johnson*, 2021 IL 126291, ¶ 52. Even if professionally unreasonable, an error by counsel does not warrant setting aside a judgment in a criminal proceeding if the error had no effect on the judgment. *Id.* ¶ 54. Attorney errors vary infinitely and are as likely to be utterly harmless as they are to be prejudicial. *Id.* "A reasonable probability that, but for counsel's errors, the result of the proceeding would have been different is a 'probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). Where a defendant challenges his conviction, the

question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt regarding guilt. *Id.*

¶ 26    Further, *Strickland* requires that a defendant affirmatively prove that prejudice resulted from counsel's errors. *Johnson*, 2021 IL 126291, ¶ 55. It is not enough for the defendant to show that the errors had some conceivable effect on the outcome. *Id.* Put another way, satisfying the prejudice prong requires showing actual prejudice and not simply speculation that the defendant might have been prejudiced. *Id.*

¶ 27    A defendant's failure to show either defective performance or prejudice will defeat a claim that counsel was ineffective. *Johnson*, 2021 Il 126291, ¶ 53. Thus, if it is easier to dispose of an ineffective assistance claim on the basis that it lacks a showing of sufficient prejudice, a court may proceed directly to the prejudice prong and need not determine whether counsel's performance was deficient. *Id.*

¶ 28    Section 115-7(a) of the Code bars, in sexual assault cases such as this one, the introduction of evidence of the victim's prior sexual activity, except either (1) to show consent or (2) when constitutionally required to be admitted. 725 ILCS 5/115-7(a) (West 2016). A defendant has a constitutional right to present evidence that is directly relevant to matters at issue in the case, notwithstanding that it concerns the victim's prior sexual activity. *People v. Santos*, 211 Ill. 2d 395, 405-06 (2004). Put another way, in some instances, due process requires the admission of evidence of the victim's prior sexual activity where that evidence is relevant to a critical aspect of the defense. *People v. Anthony Roy W.*, 324 Ill. App. 3d 181, 186 (2001).

¶ 29    Here, we need not decide whether trial counsel was deficient for failing to seek admission, at trial, of N.T.'s statement regarding "grandpa," because we can dispose of the ineffectiveness claim based on a lack of prejudice. To that end, we begin with Gloria's testimony about who

babysat N.T. On direct examination, Gloria testified that, while she, defendant, and her children lived on Matthew Drive, Exposition Avenue, and Blackhawk Street, defendant watched the children while she worked. On cross-examination, defense counsel asked Gloria about the State's "questions about who would watch the girls while [she] [was] at work." Gloria acknowledged testifying that defendant "would watch the girls." Counsel then asked Gloria several questions about who, besides defendant, watched the children while she was at work. Gloria ultimately testified that only defendant or Gloria's sisters watched the children while she was at work. Notably, counsel's line of inquiry on cross-examination specifically referenced Gloria's testimony on direct examination about who watched the children while she and her children *lived with defendant* on Matthew Drive, Exposition Avenue, and Blackhawk Street. However, in her statement to the child investigator, N.T. said that the incident with "grandpa" occurred *before* her mother met defendant. Accordingly, Gloria's testimony about who babysat N.T. after she met defendant would not have conflicted with N.T.'s statement that "grandpa" babysat her and, thus, would not have shown that N.T. was fabricating her story about "grandpa." Given its lack of probative value, N.T.'s statement would not likely have produced a different outcome at trial.

¶ 30    The likelihood of a different outcome was further diminished by the significant evidence of defendant's guilt. N.T. testified credibly to several incidents that occurred on Matthew Drive in which defendant touched her breasts while placing his penis against her vagina or anus. She also testified to other incidents that took place while the family lived in Aurora. In one incident, defendant placed his penis in her vagina and touched his penis against her anus. In the other incident, N.T., who was wearing orange underwear, felt something like water come out of defendant's penis while it was against her "butt." Gloria gave the police an orange pair of N.T.'s underwear, on which semen was found that matched defendant's DNA, thereby corroborating

N.T.'s version of the incident. The DNA evidence was the most compelling evidence of defendant's guilt. Although defendant testified that Gloria said that she put his semen on the underwear to trap him for being unfaithful, defendant admitted that he had told no one, including his attorneys, this story before he testified. The trial court found defendant's explanation "somewhat incredulous." We cannot disagree.

¶ 31     Given the significant evidence of defendant's guilt, combined with the minimal, if any, probative value of N.T.'s statement about her prior sexual activity involving "grandpa," the failure of trial counsel to seek admission of N.T.'s statement did not prejudice defendant. Thus, defendant was not denied the effective assistance of counsel.

¶ 32                            III. CONCLUSION

¶ 33     For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 34     Affirmed.