NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231291-U

NO. 4-23-1291

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 8, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| KEITH DELAO, | ) | No. 19CF1053 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert Randall Wilt, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant failed to establish that he was denied the right to the effective
assistance of counsel at his bench trial for first degree murder.

¶ 2    Defendant, Keith Delao, was convicted of one count of first degree murder (720

ILCS 5/9-1(a)(2) (West 2018)) following a bench trial. The trial court subsequently sentenced

him to 20 years of imprisonment. Defendant appeals directly from his conviction and sentence,

arguing he was denied his right to the effective assistance of counsel. Specifically, defendant

contends that counsel's inability to impeach the State's key witness with each of her prior

inconsistent statements was objectively unreasonable and that, but for this and three additional

evidentiary mistakes counsel made at trial, there is a reasonable probability he would have been

acquitted. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                   A. The Charges

¶ 5            In May 2019, defendant was indicted on numerous counts of first degree murder

(*id.* §§ 9-1(a)(1)-(3) (West 2018)) (counts I through XII), two counts of aggravated battery

(*id.* §§ 12-3.05(c), (f)(1)) (counts XIII and XIV), one count of aggravated unlawful restraint

(*id.* § 10-3.1(a)) (count XV), and one count of unlawful restraint (*id.* § 10-3(a)) (count XVI). The

State alleged that the charged conduct occurred on public property—namely, Fairgrounds Park in

Rockford, Illinois. The State ultimately dismissed 15 of the 16 counts and proceeded to trial on a

single count of first degree murder, which alleged that on April 26, 2019, defendant "stabbed

Ronnie Ray in the head, neck, and torso, knowing such acts created a strong probability of death

or great bodily harm to Ronnie Ray, thereby causing the death of Ronnie Ray."

¶ 6                                   B. The Bench Trial

¶ 7            Defendant's bench trial commenced on September 27, 2021, and concluded on

September 30, 2021. We discuss only the evidence that is relevant to defendant's ineffectiveness

claim.

¶ 8                                   1. *Xavious Smith*

¶ 9            Xavious Smith testified that on April 26, 2019, he and Shelton Hightower walked

to Fairgrounds Park at approximately 9 p.m. to drink alcohol and talk. As they were entering the

park, they heard a male voice screaming, "Help me, please help me, help me." Smith testified the

voice was coming from near the park's gazebo, which he opined was approximately 300 yards

away. Smith thought the screaming was just "people fighting over the last bit of whatever," so he

and Hightower "didn't rush" toward the gazebo "but [they] just proceeded to walk over there."

As they were walking toward the gazebo, they saw "a shadowy figure *** walking calmly, you

know, just like a slow strut away from *** the gazebo." Smith testified that he was approximately 300 yards away when he "first got a glimpse" of the "shadowy figure," and the figure was still "pretty far away" when the individual seemingly heard them approaching the gazebo and "decided to walk off" toward the street. Smith testified that he could not tell what the individual was wearing because it was dark and there was no lighting in the area. When Smith and Hightower got to the gazebo, Smith opened the case of beer they had brought with them and "started drinking." Smith testified, "[A]s soon as I sat down and took like another step over just to kind of like throw away my cigarette butts and stuff, that is when I stepped in his blood." Smith and Hightower then pointed the flashlights on their phones toward the ground and, for the first time, observed the victim "laying there [bleeding], eyes wide open and staring up at nothing, nothing at all." Hightower called 911 "immediately" and Smith performed cardiopulmonary resuscitation on the victim until the paramedics arrived.

¶ 10 On cross-examination, defense counsel asked Smith if he had told the police when questioned at the crime scene on the night of the murder that the "shadowy figure" was wearing dark clothing, a baseball cap, and a baggy hoodie. Smith testified, "I did not get a clear picture of the suspect. *** I did not see anything besides a shadowy figure walking away from that *** gazebo. I could not give a description of clothes, race, height or anything of the sort. It's too dark over there." However, Smith agreed that if that is what he had told the police at the scene, then that would have been the truth about what he had observed. Defense counsel then asked Smith if he recalled telling detectives in a video-recorded interview at the police station several hours after the murder that the person he saw was wearing "really skinny jeans" and "tight, tight pants like a girl." Smith testified that he did not recall making that statement, but he acknowledged that, "if it's on the record with the police ***, then I must have said it then."

- 3 -

¶ 11                                    2. *Ashley Cowley*

¶ 12            Ashley Cowley testified that she was at Fairgrounds Park on April 26, 2019, with

her children, her sister, and a friend to celebrate her nephew's birthday. Cowley's group was

"[b]arbecuing, playing, [and] having fun" at the gazebo located on the south side the park.

Cowley testified that a "homeless black guy," later identified as Jermaine McGee, was already at

the gazebo when they arrived. Not long after Cowley and her group had arrived at the park, two

men and a woman, later identified as defendant, Ronnie Ray, and Heather McCord, walked up to

the gazebo together and sat at one of the picnic tables. Cowley testified that McCord was only at

the park approximately 20 minutes before she left the park in a red car. After McCord left,

defendant and Ray briefly joined Cowley's group as they ate, "then [defendant] took [Ray] back

to the table, and there was a discussion over the book bag." Cowley elaborated that Ray was

holding onto a book bag and defendant would approach him repeatedly in an aggressive manner,

telling him to "give me my shit." Cowley testified that she overheard defendant angrily tell Ray

that " '[McCord] ran off with our shit,' " and "so he was taking it out on [Ray]."

¶ 13            Cowley testified that at this point, she had to intervene in the exchange between

defendant and Ray to try to calm them down because there were children present. However,

despite separating them several times, Cowley testified that defendant "kept trying to fight [Ray],

like keep going over there for the book bag, like keep going, keep going, keep going." Cowley

testified that after Ray had refused to give defendant the book bag "like a hundred times,"

defendant proceeded to pull out a pocketknife and wield it at Ray in a threatening manner while

continuing to demand that he give him the book bag. Cowley testified that when she saw

defendant pull out the pocketknife, she quickly gathered the children and their belongings and

"had to run to the car." Cowley explained the reason she felt it was necessary to leave as follows:

"Well, [defendant] kept trying to fight [Ray]. He kept trying to—whatever [Ray] *** had, he really wanted it, and he was really mad that [McCord] ran out, so now with that going on, it started getting out of hand. I felt it." Cowley testified that as the children were getting into the vehicle, she witnessed defendant and Ray "pushing back and forth, back and forth" until it "got quiet" and Ray backed away from defendant. Cowley testified that she then witnessed defendant stab Ray numerous times. Cowley indicated that Ray ended up with his back turned to defendant during the attack, at which point defendant "went crazy, like, he flipped" and "kept stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing." Cowley testified that defendant "ran" away as she and her family were leaving the park. Cowley further testified that although she was not certain, she believed that McGee was still near the gazebo when she left the park and had also witnessed the stabbing.

¶ 14　　　　On cross-examination, Cowley denied having had a vehicle at the park on the day in question. She indicated instead that she had ordered a ride to and from the park using the Lyft rideshare service. Cowley acknowledged that she called the police the day after the murder and provided a statement to them at the police station on April 28, 2019. Defense counsel asked Cowley if it was true that she had "never mentioned" certain details from her trial testimony when providing her statement to the police on April 28. For instance, defense counsel asked Cowley, "[D]uring that recorded interview, you never mentioned ever seeing a weapon, correct?" Counsel also asked about there being "no reference at all to seeing anyone get stabbed, correct?" and "[n]o reference at all to a knife, correct?" Cowley acknowledged that she never told the police during the interview at the police station that she had seen defendant with a knife or that she had seen him stabbing Ray. Cowley testified that she had lied to the police about certain things in the interview because she "was scared to tell them the truth because [she] ***

- 5 -

didn't want to get in it." However, Cowley denied having previously told the police that her godmother, Lynetta Washington, was at the park with her on the day in question. In fact, Cowley testified that she did not "even know who that [wa]s." Cowley acknowledged that on May 12, 2021, she had informed "one of the prosecutors as well as a victim witness coordinator with the State" that she had omitted certain details from her April 28, 2019, statement because she had been scared. Specifically, Cowley revealed for the first time on May 12, 2021, that she had actually "seen a tussle" between Ray and defendant before she left the park. However, she did not mention anything about a knife or having witnessed a stabbing. Cowley further acknowledged that on July 26, 2021, she spoke with "the investigator for the State's Attorney's Office" and revealed for the first time that she had actually witnessed defendant pull out a pocketknife and he "was still punching [Ray] with the open blade knife" as she was driving away.

¶ 15                                    3. *Bradley Shelton*

¶ 16            Bradley Shelton, a detective with the Rockford Police Department, testified that he interviewed Smith at the police station during the early morning hours of April 27, 2019, and the interview had been video-recorded. After establishing a foundation for admitting the video, defense counsel, to complete his impeachment of Smith, asked Shelton about his recollection of certain statements Smith had made in the interview. In particular, counsel asked  Shelton if he recalled the description Smith had given of the person he had seen walking away from the crime scene. Shelton testified, "I believe he said he was about five-six, five-eight and about 160 pounds, dark clothing, tighter pants he described. He said he was about 70 yards away at the time he told me." Defense counsel then played a portion of the interview in which Smith described the person's clothing as follows: "All I can tell you is, baseball cap, hoodie, and maybe them really

skinny jeans, you know, *** tight, tight pants, like a girl." Defense counsel did not request to publish the portion of the video in which Smith opined that he was approximately 60 yards away from the person when he first observed them walking away from the gazebo.

¶ 17    Detective Shelton testified that he interviewed Cowley at the police station two days after the murder, and the interview was video-recorded. Defense counsel, attempting to complete his impeachment of Cowley, asked Shelton if he recalled her having made various statements during the interview. The State objected to counsel's line of questioning, arguing as follows:

> "MS. KRIVANEC [(ASSISTANT STATE'S ATTORNEY)]: [Cowley] was never confronted about every single aspect of her testimony line by line from a prior statement. So [defense counsel] doesn't get to go now line by line through her interview when she was never confronted and given the chance to either acknowledge the statement, which would perfect impeachment, or deny the statement which would then require defense counsel to prove it up for it to come in substantively. The limited questions she was asked about ['D]id you tell on this date Detective Shelton X, Y, Z?['] Those are the questions he is now able to *** ask Detective Shelton to perfect if she denied, otherwise it is hearsay."

After a lengthy discussion between the trial court and the attorneys, the court ruled that once defense counsel laid a proper foundation for Cowley's video-recorded interview, it could be admitted into evidence as an exhibit. However, the court cautioned defense counsel as follows: "You are not going to be able to publish the entire exhibit, so it will be an exhibit that you can publish the portions of the exhibit that relate to statements that you confronted [Cowley] on whether or not she admitted or denied having made those statements."

¶ 18        After laying a foundation for admitting the video, defense counsel played a portion of it in which Cowley stated that her godmother, Washington, had been at the park with her on April 26, 2019. However, the trial court refused to consider the end of the video clip, in which Cowley provided Washington's age, address, and phone number. The court found that defense counsel had failed to confront Cowley with those specific statements during his examination of her. Next, defense counsel played a portion of the video in which Cowley told Shelton that the only reason she was "pointing [McGee] out [was] because he was there when we left; because when we left it had to happen." Defense counsel also attempted to play a portion of the video in which Cowley stated, in a phone call with a friend while alone in the interview room, that "it had to happen [as] soon as we left. [Defendant] did want to beat [Ray] up." The State objected to the publication of this statement on the basis that the "detective [wa]s not even in the room." Defense counsel acquiesced to the State's objection, noting he "didn't realize that." Lastly, counsel played a portion of the video in which Shelton asked Cowley if she had seen anyone "pull out any kind of weapons," and Cowley answered, "No, that's the crazy part, I didn't see no weapon."

¶ 19        Because defense counsel had failed to confront Cowley on the witness stand with each inconsistent statement from her interview at the police station, he was unable to publish some of those statements to the court. Specifically, when Shelton informed Cowley that the police were looking for surveillance video near the park, Cowley stated, "You gonna [sic] see my little red car" in the video. Further, when asked whether she had seen "any punches thrown" by Ray or defendant, Cowley stated, "No, they was [sic] just pushing each other." Cowley's statements about her "little red car" and no punches being thrown, along with her statement during the phone call, were not published to the court.

¶ 20                                   4. *Heather McCord*

¶ 21          Heather McCord testified that on the afternoon of April 26, 2019, she met with Ronnie Ray, whom she had just met the week prior, at Fairgrounds Park to "party, have fun." McCord testified that Ray was by himself at the park, and she explicitly denied having seen defendant at any point or even knowing who defendant was. McCord "was going through withdrawl [*sic*]" at the time, so while she was at the park with Ray, she called her "dope dealer" to "get some dope [to] get [her] sick off." McCord testified that Ray gave her $20 because "he thought she was clean from the heroin and assumed [she] was purchasing crack cocaine because he wasn't doing heroin." McCord explained, however, that she had only wanted to buy heroin, so she took Ray's money and then "made a story up [to] fit the script, and then [she] just took off with it" and "had no intentions of coming back *** at all." McCord testified that she left her purse with Ray at the park while she went to purchase the drugs "[t]o make it seem like [she] wasn't going to take off" with his money.

¶ 22          McCord acknowledged that she had been interviewed by police at the police station on April 28, 2019. The State confronted McCord with several of her statements from that interview that were inconsistent with her trial testimony. McCord denied having ever made the statements. One specific statement the State asked McCord about was whether she indicated in the interview that, shortly after she left the park to purchase drugs, Ray texted her "Where are you at? My homie is tripping." Defense counsel objected to the question on foundational grounds, but he made no objection that the statement constituted inadmissible hearsay. Although McCord acknowledged that someone using Ray's phone had texted her after she left the park, she refused to say definitively that that person had been Ray. She testified, "It could have been anybody using [Ray's] phone. So it could have been a person at the park. It could have been one

- 9 -

of the people grilling out. I mean, they just kept saying, ['P]lease don't do this. Come back with the 20 bucks.[']"

¶ 23                                        5. *Michelle Bootz*

¶ 24        Michelle Bootz, a detective with the Rockford Police Department, testified that she and another officer interviewed McCord at the police station on April 28, 2019, and the interview had been video-recorded. After establishing a foundation for admitting the video and asking Bootz about certain statements McCord made during the interview, the State played portions of the video, detailed below, to the trial court to perfect its impeachment of McCord.

¶ 25        In the video-recorded interview, McCord told the detectives that she had agreed to meet Ray, and only Ray, at Fairgrounds Park on April 26, 2019, but Ray ultimately showed up at the park with defendant. McCord said that defendant, who was wearing camouflage pants at the time, introduced himself and indicated that he was from Chicago. McCord told the detectives that Ray had wanted to purchase "two crack bags," so she called her drug dealer to have them pick her up at the park. As the drug dealer was about to arrive, Ray informed McCord that defendant "wanted to date her too." Defendant told McCord that he was only going to pay her $20, and he did, in fact, give her two $10 bills. McCord told the detectives that defendant "was freaking her out" and "looking weird and saying weird shit." For instance, McCord indicated that defendant had said to her, "You are not going to back out, you are going to let me touch you wherever, right?" and "I know you're not gonna [*sic*] run [off with the money] cause I'll chase you." McCord told the detectives that she had believed both defendant and Ray "wanted to date [her] and smoke [her] crack bag, so [she] ran off with their 20 bucks." McCord also told the detectives that Ray had sent her numerous text messages after she left the park, pleading with her to not run off with the money. His last text message to her read, "Where are you at? My homie is

tripping."

¶ 26                                    6. *Matthew Myrick*

¶ 27          Matthew Myrick testified that he had been living at the Rockford Rescue Mission

in April 2019 and defendant was one of his friends at the shelter. Myrick testified that he had a

brief conversation with defendant around lunchtime on April 26, 2019. Myrick testified that

defendant was wearing "camo pants and a black jacket" and carrying a book bag at the time. A

security camera at the shelter recorded their interaction on video, and the video was introduced

into evidence and published to the court. The video corroborates Myrick's testimony that

defendant was wearing "camo pants and a black jacket."

¶ 28                                    7. *Bernard Thompson*

¶ 29          Bernard Thompson testified that on April 26, 2019, he had lunch with defendant

and Ronnie Ray at the Rockford Rescue Mission, which is where the three of them had been

staying at the time. After lunch, the three men walked to a "dope house" to purchase and

consume crack cocaine. Thompson testified that while they were at the house, defendant told him

that he had a knife in his backpack, but Thompson never actually saw defendant with a knife.

After several hours, defendant and Ray left the house to purchase alcohol. Thompson testified

that he stayed at the house because the "dope guy told me don't go with them because he didn't

feel comfortable with [defendant], so he told me don't go with them." On cross-examination,

Thompson acknowledged that he had spoken with detectives on April 29, 2019. He testified that

he recalled telling the detectives that defendant had been wearing "Army pants" and carrying a

"big black [book] bag" when he was with him on April 26, 2019.

¶ 30                                    8. *Jaivon Dorris*

¶ 31          Jaivon Dorris testified that he had been living at a homeless shelter in Chicago in

early May 2019 and he knew defendant through the shelter. Dorris testified that on May 2, 2019, he and defendant were smoking marijuana and talking in the stairwell of a fitness center. Dorris recalled that defendant was wearing "a baggy hoodie, baggy, like, jeans or cargo jeans and [carrying] a book bag" at the time. Dorris thought that defendant seemed "a little on edge," so he asked him what was wrong. At first, defendant told Dorris that "it was just a situation that happened in a park in Rockford" and he did not want to talk about it. However, after Dorris prodded him further, defendant gradually disclosed more details about the "situation." Defendant told Dorris that he had been with a "guy" in Rockford and they "were partying together" and using "crack." Defendant said he "passed out" at some point and "woke up to the guy allegedly going in his pocket." Dorris asked defendant what happened after that, and defendant leaned in closer to him and said, "I just snapped and it's bad." Defendant also mentioned to Dorris that the police were searching for him. Dorris testified that he "got to kind of looking at [defendant] closer" and noticed that he had scratches and scars on his hand. At the end of their conversation, defendant said, "[W]ell, you know, he is a crack head so, you know, kind of like the best way I can think about it or put it is that he is in a better place now." Dorris testified that the conversation had been bothering him, so he called the police several days later to disclose the details of the conversation. On cross-examination, Dorris acknowledged that he had not informed the police of defendant's statement concerning a "crack head being in a better place." Dorris explained that he withheld that information because he "was hoping to lessen [his] involvement as much as possible throughout the whole process."

¶ 32                             9. *Nicholas Weber*

¶ 33        Nicholas Weber, a crime scene detective with the Rockford Police Department, testified that he processed the crime scene shortly after Ray had been transported to the hospital

and pronounced dead. Weber testified that he took pictures of the crime scene and the surrounding area, marked various items with evidence markers, and then photographed and collected the marked items. Weber testified that he photographed and collected, in pertinent part, a cigarette butt that was on the ground in the gazebo and lying in the middle of blood splatter.

¶ 34     Weber also identified a Google Maps image that had been generated as part of the investigation. He testified that the image was a "general map of the area around Fairgrounds Park." The image of the map was admitted into evidence and published to the court. On cross-examination, Weber testified that he was familiar with Noble's Groceries, and he agreed with defense counsel's estimation that the store was located approximately four blocks away from the intersection closest to the gazebo in Fairgrounds Park. Through a stipulation of the parties, security video from one of the store's exterior security cameras from the night of April 26, 2019, was admitted into evidence. The security video shows a man wearing baggy camouflage pants, a black jacket, a black hat, and carrying a black book bag walking in front of the store at 9:45 p.m.

¶ 35     10. *Amy Kuhls*

¶ 36     Amy Kuhls, an assistant supervisor with the Rockford 911 Division, testified that she was familiar with the Rockford Police and Fire Department Computer-Aided Dispatch (CAD) system. She identified a copy of the relevant CAD ticket and testified that, according to the ticket, Hightower's 911 call was placed at 9:42 p.m.

¶ 37     11. *Heather May*

¶ 38     Heather May, a forensic scientist with the Illinois State Police, testified that she conducted DNA testing on the cigarette butt that had been collected at the crime scene. May testified that she identified a mixture of two male DNA profiles on the cigarette butt. She ultimately concluded that both defendant and Ray "[we]re included as contributors to the [DNA]

mixture" found on the cigarette butt.

¶ 39                                    12. *Mark Peters*

¶ 40          Mark Peters, a forensic pathologist, testified that he performed the autopsy on Ray. Peters testified that, in performing the autopsy, he observed 37 "sharp force injuries" to Ray's "face, scalp, neck, shoulders, chest, abdomen, arms and right armpit area." Peters testified that the injuries were located on both the front and the back of the body.

¶ 41                              13. *Defense Counsel's Closing Argument*

¶ 42          Defense counsel began his closing argument by advancing what the trial court later described as a "quasi-alibi" defense. Counsel highlighted Smith's prior statement from his video-recorded interview, in which he described the person he had seen walking away from the crime scene as follows: "All I can tell you is, baseball cap, hoodie, and maybe them really skinny jeans, you know, *** tight, tight pants, like a girl." Counsel argued that the person Smith described "was the murderer, and that person was not [defendant]" because defendant was carrying a book bag and wearing baggy camouflage pants at the time, as evinced, in part, by the Noble's Groceries security video recorded at 9:45 p.m. that shows "a person that matches the description of" defendant "[w]alking very casually." According to defense counsel, "the person you see in the Noble's video is not the person that Xavious Smith saw." Counsel maintained this was not only because the person's clothing in the video did not match Smith's description of the person leaving the crime scene, but, also, because the security camera, which was located four or five blocks away from the crime scene, recorded the person a mere three minutes after the 911 call had been placed. In addition to the "quasi-alibi" defense, counsel also argued, pointing to specific examples he had elicited through cross-examination, that the trial court must "completely disregard" Cowley's testimony in light of the numerous versions of events she had

provided and her "unbelievable" trial testimony.

¶ 43                                    14. *The Trial Court's Finding*

¶ 44        On October 6, 2021, the trial court issued a lengthy and detailed oral ruling,

finding defendant guilty of first degree murder beyond a reasonable doubt. The court began by

rejecting defendant's "quasi-alibi" defense. First, the court found that the distance between the

crime scene and the Noble's Groceries security camera was "the equivalent of like a three-city

block area." It then provided the following reasoning for finding that the person seen in the

Noble's Groceries security video at 9:45 p.m.—whom the court described as "somebody wearing

[defendant's] clothing, matching exactly the clothes that witnesses identified [defendant] as

wearing"—could have been the murderer despite the 911 call being made at 9:42p.m.:

> "So in the 300 yards that it took Mr. Smith and Mr. Hightower to walk to
> the gazebo, the figure walking away had 300 yards to walk. While [they] opened
> their beers and started to drink, the figure could have continued to walk further
> away. And then when *** Mr. Smith *** was walking around and stepped on
> something wet, that figure was still walking away. When the two of them turned
> on their phones to see what it was and found Mr. Ray on the ground, that figure
> was still walking away. When Mr. Smith tried to stop the bleeding, that figure
> was still walking away. And then, finally, *** the 911 call was made at 9:42
> [p.m.].
>
> So what it comes down to is the figure had—whoever that shadowy figure
> was walking away had plenty of time to continue to walk the approximate three
> city blocks, if you will, at least a large portion of the three city blocks, before the
> 911 call came in. And then after the 911 call, they had another three minutes to

walk before they were in front of the Noble's Grocery Store [*sic*].

So I don't find that the quasi-alibi, as I refer to it, is really dispositive of this at all. I think it is very likely, based upon the evidence and the breakdown of the evidence, that this gentleman, if he was the shadowy figure, had plenty of time to walk to Noble's from the incident at the gazebo. So that's the first question."

¶ 45        Next, the trial court addressed Cowley's testimony. The court noted that while the "evidence doesn't turn entirely on [her] testimony," [her testimony] turns this case from a circumstantial case to a direct evidence case." It further noted that it could believe her statement to police, her trial testimony, or neither. Ultimately, the court found Cowley's trial testimony to be credible. The court found that she had a motive to lie to police in 2019, which she explained at trial, but she did not have a motive to lie at trial. Moreover, the court found that "she knew things in her testimony that she would not have known unless she had seen them." Specifically, she knew about the knife, Ray suffered stab wounds to the front and back of his body, and Ray sustained numerous stab wounds. The court also found that Cowley's trial testimony was corroborated by McCord's statement to police and the physical evidence—particularly the cigarette butt located on top of the blood splatter—both of which placed defendant with Ray under the gazebo, where his body was ultimately discovered. Finally, in concluding its reasoning for finding Cowley credible, the court indicated that there was "not really" any evidence that "undercut what she testified to at trial."

¶ 46                                C. Posttrial Proceedings

¶ 47        After the trial court issued its guilty finding, defense counsel informed the court that defendant had filed a motion for a new trial that included allegations of ineffective assistance of counsel. The court conducted a preliminary inquiry into defendant's allegations

pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), and subsequently appointed *Krankel* counsel. The court told defendant that he would have to inform *Krankel* counsel of "any and all reasons you believe that [defense counsel] was ineffective and negligent in his performance. And that's what it comes down to, at least for the *Krankel* issue, was he negligent in his duty as an attorney." The court explained, "It's a different issue for purposes of a motion for new trial or issues of appeal later on. Then, that's when the *Strickland* case [(*Strickland v. Washington*, 466 U.S. 668 (1984))], the *Strickland* test really kicks in." Following a *Krankel* hearing at which both defendant and defense counsel testified, the court ruled that defendant's ineffective-assistance claims lacked merit. While issuing its ruling, the court noted, "[T]he issue here is did he neglect his job as a defense attorney?" The court also denied defendant's motion for a new trial at a later hearing.

¶ 48 On November 15, 2023, the trial court conducted a sentencing hearing and ultimately sentenced defendant to 20 years' imprisonment.

¶ 49 This appeal followed.

¶ 50 II. ANALYSIS

¶ 51 On appeal, defendant argues he was denied his right to the effective assistance of counsel at his bench trial for first degree murder. Specifically, he asserts that counsel performed deficiently by failing to (1) follow proper impeachment procedure in order to introduce all of Cowley's prior inconsistent statements, (2) resist the State's objection to the introduction of the prior inconsistent statement Cowley made in her phone call while alone in the interview room, (3) impeach Smith with his prior inconsistent statement that he was only 60 yards away when he first saw a person walking away from the crime scene, rather than 300 yards away, and (4) object to McCord's hearsay testimony concerning text messages Ray had sent to her shortly before his

death. According to defendant, the "mistakes regarding Ashley Cowley were of such a magnitude that they prejudiced [him] on their own, but the prejudice was only compounded by the mistakes regarding Xavious Smith and Heather McCord."

¶ 52    Criminal defendants have the right to the effective assistance of counsel under both the United States and Illinois constitutions. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Claims of ineffective assistance of counsel are analyzed under the framework set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Domagala*, 2013 IL 113688, ¶ 36. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). "Where, as here, a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *People v. Johnson*, 2021 IL 126291, ¶ 54. "Because a defendant must establish both a deficiency in counsel's performance and prejudice resulting from the alleged deficiency, failure to establish either proposition will be fatal to the claim." *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996); see *Albanese*, 104 Ill. 2d at 527 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (Internal quotation marks omitted.)). In reviewing ineffectiveness claims, "this court employs a bifurcated standard of review, deferring to the trial court's findings of fact unless they are against

the manifest weight of the evidence and considering *de novo* the ultimate legal issue of whether counsel's omission supports an ineffective assistance claim." *People v. Cunningham*, 2012 IL App (3d) 100013, ¶ 31.

¶ 53    "It is a well settled general rule that what a witness states out of court and out of the presence of the defendant is pure hearsay and is incompetent as substantive evidence." *People v. Simpson*, 2015 IL 116512, ¶ 27; see *People v. Thomas*, 354 Ill. App. 3d 868, 884 (2004) ("[I]n general, a prior inconsistent statement is admissible solely for impeachment purposes, not as substantive evidence of the truth of the matter asserted."). However, section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2020)) provides for an exception to the general rule that prior inconsistent statements are inadmissible as substantive evidence. Specifically, section 115-10.1 provides that a party may introduce a witness's prior inconsistent statement as substantive evidence if, in pertinent part: (1) the statement is inconsistent with the witness's trial testimony; (2) the witness is subject to cross-examination concerning the statement; and (3) the statement "narrates, describes, or explains an event or condition of which the witness had personal knowledge;" and (4) the statement "is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." *Id.*

¶ 54    In *People v. Payton*, 72 Ill. App. 2d 240, 248 (1966), the Fifth District described the procedure for impeaching a witness with a prior inconsistent statement as follows:

> "Before a witness may be impeached by a prior statement, a proper foundation must be laid in order to alert the witness, avoid unfair surprise, and to give the witness a chance to explain. The witness must first be asked as to the time, place and persons involved in the alleged conversation; secondly, he must

be asked whether he made a certain contrary statement at that time. *** When the impeaching witness is produced, the proper course is simply to ask him whether or not the witness to be impeached made the statement in regard to which he has been questioned at that time and place mentioned. It is improper to ask the impeaching witness to relate the whole conversation."

¶ 55    Here, we find it unnecessary to determine whether counsel performed deficiently, as defendant complains, because even if we found deficient performance, we would nonetheless reject defendant's ineffectiveness claim on the basis he has failed to establish any resulting prejudice. See *Sanchez*, 169 Ill. 2d at 487.

¶ 56    At trial, the State presented uncontroverted evidence that defendant was wearing camouflage pants on the day in question. Cowley testified that she was at Fairgrounds Park celebrating her nephew's birthday on the afternoon of April 26, 2019, and shortly after she had arrived at the park, defendant, Ray, and McCord walked up to the nearby gazebo and sat at one of the picnic tables. Cowley testified that approximately 20 minutes later, McCord got into a vehicle and left the park. Not long after McCord had left, defendant began getting aggressive with Ray and demanding that Ray give him the book bag he was holding. Cowley overheard defendant angrily tell Ray that "[McCord] ran off with our shit." Cowley testified that, at a certain point, "it started getting out of hand" because defendant "was really mad that [McCord] ran out" and angry that Ray would not give him the book bag. Cowley testified that when Ray refused to give defendant the book bag "like a hundred times," she observed defendant pull out a pocketknife and wield it at Ray in a threatening manner. Cowley testified that as she was rushing the children to the vehicle to get away from defendant and Ray, she witnessed the two "pushing back and forth, back and forth" until Ray ended up separated from defendant, with his back to

him. Cowley testified that defendant then "went crazy, like, he flipped," and he "kept stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing, stabbing."

¶ 57    The trial court found Cowley's testimony to be credible, in part, because it was corroborated by McCord's statements from her recorded interview with police on April 28, 2019, which were introduced as substantive evidence pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2020)), and we find it was also corroborated by the testimony of Thompson. Specifically, Thompson testified that he had gone to a "dope house" with defendant and Ray after lunch on April 26, 2019, to purchase and use crack cocaine. While at the house, defendant told Thompson that he had a knife in his backpack, although Thompson never actually saw a knife. In her recorded statement to police, McCord said that she had agreed to meet Ray at Fairgrounds Park on the afternoon of April 26, 2019, but Ray ultimately showed up at the park with defendant. Defendant gave McCord $20 to purchase crack cocaine for him and to possibly "date" her. McCord stated that defendant "was freaking her out" and "looking weird and saying weird shit." McCord indicated that defendant had said to her, "You are not going to back out, you are going to let me touch you wherever, right?" and "I know you're not gonna [*sic*] run [off with the money] cause I'll chase you." McCord told the detectives that she believed both defendant and Ray had "wanted to date [her] and smoke [her] crack bag, so [she] ran off with their 20 bucks." McCord also told the detectives that Ray's last text message to her read, "Where are you at? My homie is tripping." We cannot say that the trial court's finding that Cowley's testimony was corroborated by McCord's prior statement was against the manifest weight of the evidence.

¶ 58    The trial court also found that Cowley's testimony was further corroborated by the physical and video evidence presented and the testimony of Dorris. Specifically, a cigarette

butt with defendant's DNA on it was located on top of blood splatter. The cigarette butt itself had no blood on top of it, indicating it likely had been deposited there after the stabbing had occurred. Moreover, the Noble's Groceries security camera, which the court found was located three blocks away from the crime scene, captured an individual carrying a book bag and wearing camouflage pants walking down the street several minutes after the stabbing. Peters, who performed the autopsy on Ray, testified that Ray had sustained 37 "sharp force injuries" to his "face, scalp, neck, shoulders, chest, abdomen, arms and right armpit area," and the injuries were to the front and back of Ray's body. Additionally, Dorris testified that he had had a conversation with defendant in early May 2019 and noticed that defendant seemed "a little on edge." Defendant initially told Dorris that "it was just a situation that happened in a park in Rockford" and he did not want to talk about it further. However, after some prodding from Dorris, defendant told him that he had been with a "guy" in Rockford and they "were partying together" and using "crack." Defendant said he had "passed out" at some point and "woke up to the guy allegedly going in his pocket." Defendant told Dorris, "I just snapped and it's bad," and the police were searching for him. Dorris testified that he "got to kind of looking at [defendant] closer" and noticed that he had scratches and scars on his hand. Dorris testified that defendant concluded the conversation by stating, "[W]ell, you know, he is a crack head so, you know, kind of like the best way I can think about it or put it is that he is in a better place now." Again, we cannot say that the court's finding with respect to Cowley's credibility was against the manifest weight of the evidence.

¶ 59    Based on the above, we find the evidence of defendant's guilt presented at trial was overwhelming, and, for the reasons discussed below, there is not a reasonable probability defendant would have been acquitted but for the allegedly unprofessional errors committed by

counsel.

¶ 60    As stated at the outset, defendant argues that he was prejudiced by counsel's inability to introduce as substantive evidence four of Cowley's prior inconsistent statements from her recorded interview with police on April 28, 2019. Specifically, defendant points to (1) Cowley's statement identifying Lynetta Washington's age, phone number, and address; (2) her statement that investigators would see her "little red car" at the park if they discovered any surveillance video; (3) her statement that she had seen defendant and Ray pushing each other but had not seen any punches thrown; and (4) her statement—made in a phone call while alone in the interview room—that "it had to happen [as] soon as we left. [Defendant] did want to beat [Ray] up." With respect to the final statement, defendant contends that it would be "one thing" for the factfinder to find she was lying to the police in the interview, but "to conclude that she was lying to her friend would be another thing entirely." Defendant maintains that counsel's failure to introduce these statements prejudiced him because it "directly led to the finder of fact deeming a witness credible—despite the fact that in order for her trial testimony to be believed, she would have had to have lied to the police for two years."

¶ 61    We disagree that defendant was prejudiced by counsel's examination of Cowley. The statements defendant claims should have been introduced added little, if anything, to what counsel was able to accomplish in cross-examining Cowley. Counsel was able to get Cowley to admit on the stand that she had not initially told the police during her recorded interview that she had witnessed defendant stab Ray with a knife. Cowley testified that she had initially lied because she "was scared to tell them the truth because [she] didn't want to get in it." Counsel was also able to publish several portions of Cowley's video-recorded interview as substantive evidence, namely: (1) Cowley's statement that her godmother, Washington, was at the park with

- 23 -

her at the relevant time, which contradicted her trial testimony that she did not know anyone by that name; (2) her explanation that she had specifically pointed out McGee because "he was there when we left, because when we left it had to happen"; and (3) her statement that she "didn't see no weapon." Given that counsel was able to impeach Cowley with her prior inconsistent statements identifying Washington and indicating that "when we left it had to happen," the first and fourth statements identified in the preceding paragraph were merely cumulative of the evidence the trial court had already heard. See, *e.g.*, *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009) ("Evidence is considered cumulative when it adds nothing to what was already before the jury."). Similarly, the introduction of Cowley's prior statements that she had not seen any punches thrown and that her "little red car" was at the park would have had no meaningful impact on the court's determination of her credibility at trial considering she had already acknowledged that she lied to the police in the interview. Moreover, the court's finding that she had a motive to lie to police in 2019 but not at trial was not against the manifest weight of the evidence. Thus, because the prior inconsistent statements identified would have done little to further damage Cowley's credibility beyond what counsel was able to accomplish, coupled with the fact that Cowley's trial testimony was corroborated by the physical evidence and the testimony of other witnesses, we find there is not a reasonable probability the result would have been different had the prior inconsistent statements been introduced.

¶ 62    Alternatively, defendant argues that even if we were to find he was not prejudiced by counsel's failure to introduce Cowley's prior inconsistent statements, we must find prejudice when considering the effects of counsel's mistakes regarding Cowley in combination with his mistakes regarding Smith and McCord. With respect to Smith, defendant maintains that counsel should have introduced Smith's prior statement that he was only about 60 yards away—as

opposed to his trial testimony that he was approximately 300 yards away—when he first observed a person walking away from the crime scene. According to defendant, had this evidence been presented, it would have given added credence to Smith's initial description of the person, *i.e.*, that the person was wearing "tight, tight pants" instead of baggy camouflage pants, like defendant. With respect to McCord, defendant asserts that counsel should have objected on hearsay grounds to her testimony that Ray had texted her shortly before his death, "[P]lease don't do this. Come back with the 20 bucks" and "Where are you at? My homie is tripping." Defendant maintains that McCord's hearsay testimony "gave support to the State's theory of the case and none to [his]."

¶ 63    We likewise find there is not a reasonable probability defendant would have been acquitted but for the alleged mistakes concerning Smith and McCord, even when viewed in conjunction with the alleged mistakes concerning Cowley. At trial, defense counsel asked Detective Shelton what description Smith had given him of the person he had seen walking away from the crime scene.  Shelton testified, "I believe he said he was about five-six, five-eight and about 160 pounds, dark clothing, tighter pants he described. He said he was about 70 yards away at the time he told me." Thus, the trial court heard testimony that Smith had initially indicated he was only 70 yards away when he first saw the individual in question, not 300 yards away as he testified at trial. Publishing Smith's statement from the recorded interview that he was 60 yards away would have added little to Shelton's testimony. Moreover, as the court noted in its findings, after viewing the person walking away from the crime scene, Smith and Hightower still had to walk up to the gazebo, open their case of beer, begin drinking, discover Ray's body, and then attempt to stop the bleeding before calling 911 at 9:42 p.m. It is reasonable to conclude that even if Smith and Hightower were only 60 yards away when they first saw the person in question, that

person still would probably have been able to walk three or four blocks by 9:45 p.m. The fact that it was nighttime with no lighting in the area would have also cast doubt on the reliability of Smith's observations, even if made at only 60 yards. See, *e.g.*, *People v. Lerma*, 2016 IL 118496, ¶ 26 (noting that "nighttime viewing" is a factor that may "contribut[e] to the unreliability of eyewitness testimony"). Defendant's argument concerning McCord is also unavailing. The State presented portions of her recorded interview in which she told the police she had taken $20 from defendant with no intention of returning with drugs. The only reasonable conclusion to be drawn from this evidence is that defendant was angry that McCord had stolen his money. Even if the complained-of evidence had not been admitted, the court was still presented with Cowley's testimony that defendant "was really mad that [McCord] ran out." Thus, in light of the overwhelming evidence of defendant's guilt, we cannot say there is a reasonable probability he would have been acquitted but for the alleged errors concerning the testimony of Smith, McCord, and Cowley.

¶ 64       Accordingly, because we find defendant has failed to establish that he was prejudiced by counsel's allegedly deficient performance, we reject his claim of ineffective assistance of counsel. See *Sanchez*, 169 Ill. 2d at 487.

¶ 65                                III. CONCLUSION

¶ 66       For the reasons stated, we affirm the trial court's judgment.

¶ 67       Affirmed.