NOTICE

Decision filed 03/11/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 241181-U

NO. 5-24-1181

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 23-CF-1950 |
| | ) | |
| LEAH C. CLINE, | ) | Honorable |
| | ) | Robert B. Haida, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Barberis and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The record does not demonstrate that the trial court erred in finding the defendant fit to stand trial. The defendant cannot demonstrate prejudice with regard to any claim that her trial counsel was ineffective. The defendant was proven guilty beyond a reasonable doubt. Therefore, this court grants the motion of appointed counsel to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), and affirms the judgment of the trial court.

¶ 2    On August 19, 2024, a jury found the defendant, Leah C. Cline, guilty of aggravated battery, domestic battery, and resisting a peace officer. In this direct appeal, the defendant's appointed attorney filed a motion to withdraw as counsel on the ground that the appeal lacks merit. See *Anders v. California*, 386 U.S. 738 (1967). Appointed counsel provided the defendant with a copy of his *Anders* motion and accompanying memorandum of law. This court provided the defendant with ample opportunity to file a *pro se* brief, memorandum, or other document

1

explaining why counsel should not be allowed to withdraw or why this appeal has substantial merit. The defendant did not file a response. This court has examined counsel's *Anders* motion and memorandum of law, as well as the entire record on appeal, and concludes that the instant appeal does indeed lack merit. This court grants counsel's *Anders* motion to withdraw and affirms the trial court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4     On November 27, 2023, the defendant was charged, by information, with one felony count of aggravated battery, one misdemeanor count of domestic battery, and one misdemeanor count of resisting a peace officer. Count I alleged that on or about November 24, 2023, the defendant committed aggravated battery in that the defendant "knowingly caused bodily harm to William Cline, a person over the age of 60 years, in that she scratched him about the hand." Count II alleged that on that same date, the defendant committed domestic battery in that the defendant "knowingly made physical contact of an insulting or provoking nature with William Cline, a family or household member of the defendant[,] in that she grabbed him by his hands and would not release him." Count III alleged that on that same date, the defendant committed the offense of resisting a peace officer in that the defendant "knowingly resisted the performance of Deputy Chandler of an authorized act within his official capacity, being the arrest of [the defendant], knowing Deputy Chandler to be a peace officer engaged in the execution of his official duties, in that she refused to allow Deputy Chandler to put handcuffs on her hands."

¶ 5     At a hearing held on November 27, 2023, the trial court expressed concerns about the defendant's mental health. Thereafter, the court ordered a mental health evaluation for the defendant. The defendant's appointed counsel requested "a sanity evaluation by Dr. Cuneo, or a general psychological by Dr. Cuneo." The record on appeal does not contain any report from Dr.

2

Cuneo, or any other mental health examiner, from that time frame. At the defendant's next court appearance—her preliminary hearing and arraignment, held on December 22, 2023—no mention was made of the mental health evaluation.

¶ 6     On July 3, 2024, the trial court entered a written order in which it noted that defense counsel had raised a *bona fide* doubt about the "defendant's ability to assist in her own defense and understand the nature of the proceedings against her," and in which the court appointed Dr. Cuneo "to evaluate the defendant's fitness to stand trial." On July 21, 2024, Dr. Cuneo filed a written report in which he stated that he had examined the defendant on July 8, 2024, and on July 19, 2024, to evaluate her fitness to stand trial. Dr. Cuneo's report stated that he had reviewed his notes from his July 8, 2024, report (which is not contained in the record on appeal), interviewed the defendant, reviewed the charging documents, and spoken to staff—including nursing staff—at the St. Clair County Jail. The report further stated that it was the opinion of Dr. Cuneo that the defendant was fit to stand trial, notwithstanding the fact that the defendant's thinking, while not delusional, "clearly had a paranoid and sexual flavor to it," and "was often odd and metaphysical."

¶ 7     A hearing was held on July 24, 2024, but no court reporter was present, and therefore, there is no transcript. However, a written order entered on that date stated that the hearing was held for the purpose of a fitness review, and that the defendant had appeared with counsel via Zoom and waived trial on the issue of fitness. The order further stated that the parties would "stipulate that Dr. Cuneo is an expert in the field of clinical psychology and would testify consistently with his report that the defendant is fit to stand trial." The order thereafter stated that "based on this stipulation," the trial court "finds the same—[the] [d]efendant is fit."

¶ 8     The defendant's jury trial began on August 19, 2024. At the outset, the defendant addressed the court to raise several issues. She told the court that, *inter alia*, she questioned "the validity of

3

this whole case," she had "been collecting [her] own evidence," and that "[t]here's a video that's been made that is not true." She further alleged that her attorneys had not discussed her case with her and were pressuring her to accept a plea agreement. The defendant stated that the entire case against her was "based on lies," and that she had been drugged and poisoned in the county jail. The trial court asked the defendant if she had filed reports about these things, to which she responded that she had not, because she was scared, but that she planned to in the future. The court questioned her further about the present case and her representation by her counsel. The court stated that it was not surprised that the defendant disputed the evidence against her. When the court asked the defendant if she had seen the discovery in the case, she conceded that she had, and she agreed that she had at least "a working knowledge of what the allegations" against her were. She further agreed that she was ready to go to trial.

¶ 9 The trial court then asked the defendant, with regard to her representation by her counsel, in what ways she believed that representation was deficient. The defendant stated that her counsel had not done "anything" for her, and she repeated the allegation that her attorneys had not discussed the case with her, and that they just wanted her to accept a plea offer. The court thereafter questioned the defendant's lead counsel, who stated that counsel's investigator had sat down with the defendant and gone through all the State's discovery with her. Counsel stated that she was obligated to convey the State's plea offer to the defendant, which she did, but that the defendant rejected it. Counsel further stated that the defendant believed that "all of the evidence, including her own statement to police, [was] fabricated." Counsel then noted that Dr. Cuneo had evaluated the defendant on two separate occasions, and that he had found her fit to stand trial. Counsel thereafter stated that she believed they were ready to proceed to trial. The court then addressed the defendant directly, asking, "Are you ready to go to trial today?" The defendant answered, "Yes,

4

Your Honor." When the court asked the defendant if she had "anything else," the defendant answered, "No, Your Honor."

¶ 10    Following jury selection and brief opening statements, the first witness to testify for the State was William Cline. He testified that he was 87 years old on November 24, 2023, and that he was at home with his wife and one of his sons that afternoon. Cline identified the defendant in the courtroom, then testified that she, too, was present at the home on November 24, 2023. He testified that the defendant had lived with him and his family at the home for "[a]pproximately a year and a half," because Cline had learned from his other son—from whom the defendant was separated— that the defendant was homeless and needed somewhere to stay. He testified that the defendant assisted around the house by helping with the cleaning, and that she sometimes paid for groceries.

¶ 11    Cline testified that on the afternoon in question, the defendant approached him in the living room, asked him to put his hands out in front of him, then began to rub his hands while telling him that "the demons are going to get you." She was rubbing his hands hard enough to hurt and to cause his skin to break open and begin to bleed. She also tried to pull the rings off his hands, but he "fought with her and shunned her away," then "called the county police." Cline authenticated People's Exhibits 1-4, which he testified were photographs showing the injuries to his hands. The exhibits were admitted into evidence without objection and published to the jury. Cline testified that he told the defendant "several times" to stop rubbing his hands, but that she did not.

¶ 12    On cross-examination, Cline testified that he took a blood thinning medicine and that he bruised fairly easily. He agreed that the police officers who responded to his home were wearing body cameras, and that it was possible that he had told them that the defendant had also punched and kicked him. He denied, however, that she had actually punched or kicked him. He testified that he did not drink alcohol that day, or "at all."

5

¶ 13    The next witness to testify was St. Clair County Sheriff's Deputy Chase Chandler. He testified that on November 24, 2023, he responded to a domestic disturbance call at a residence in Belleville. Chandler testified that when he arrived at the residence, he saw an "elderly white male"—whom he later identified as William Cline—standing in the yard, clutching his hand and appearing to be bleeding. He testified that Cline seemed to be nervous, agitated, and anxious. Cline told Chandler that Cline's ex-daughter-in-law was still inside the residence, and had scratched Cline's hands, and kicked and hit him. Chandler identified the defendant in the courtroom, then testified that when he placed her under arrest, she "pulled away from [his] grasp *** several times." With the assistance of another officer, he was able to handcuff the defendant. He testified that she continued to resist, and that the officers "basically had to carry her" to a patrol unit to take her away.

¶ 14    Chandler testified that on the date in question, he was wearing a body camera. He authenticated People's Exhibit 5, and he testified that it was a DVD of footage from his body camera, which he had reviewed, and which "truly and accurately depict[ed] the events" he observed on the date in question. The exhibit was admitted into evidence without objection and was published to the jury. Of relevance to this appeal, the approximately two-minute video exhibit showed that after the officers entered the home at the defendant's invitation and asked her if she had any weapons on her person, the defendant raised her arms and allowed Chandler to pat her down. Chandler then asked the defendant if there was something going on in the residence. The defendant did not answer, and Chandler then asked, "Why are we here?" The defendant answered, "You know why you are here." Chandler replied, "Okay," and asked the defendant to turn around and put her hands behind her back. The defendant began to comply, but when one of her hands was cuffed, she began to turn back toward Chandler. He told her, "Turn around, don't pull away

6

from me," and the defendant then repeatedly stated, "I have to pee" as she struggled to turn toward Chandler. With assistance from other officers, Chandler eventually finished cuffing the defendant, and officers told the defendant that she was in custody and would be allowed to go to the bathroom.

¶ 15    On cross-examination, Chandler agreed that Cline told him that the defendant kicked and punched Cline, but that Cline had no injuries consistent with that. He further agreed that Cline told him that Cline took blood thinning medication. Chandler testified that Cline did not have difficulty conveying to Chandler what happened, and "was coherent enough."

¶ 16    St. Clair County Sheriff's Lieutenant Jesse Carmack testified that on November 24, 2023, he was on duty and was dispatched to a "[d]omestic-in-progress call." He identified the defendant in the courtroom as the "suspect" in the case. He testified that he assisted with the arrest of the defendant, during which the defendant was "not complying with commands" as the officers were "trying to get her into handcuffs." He testified that she was "flailing" her arms and "kind of obfuscating" the process. Carmack authenticated People's Exhibit 6 and testified that it was a DVD of footage from his body camera, which he had reviewed, and which "truly and accurately depict[ed] the events" he observed on the date in question. The exhibit was admitted into evidence without objection and was published to the jury. Of relevance to this appeal, the approximately two-minute video exhibit showed that Carmack was the first officer to enter the home, and that he observed Chandler's interactions with the defendant, then assisted Chandler in cuffing the defendant as Chandler struggled to get the defendant under control. After the exhibit was published, Carmack testified that on the date in question, both he and Chandler were wearing "standard" patrol uniforms.

¶ 17    St. Clair County Sheriff's Master Sergeant Gary Brewer testified that on November 24, 2023, he was on-duty and was assigned to investigate the incident at Cline's home. He testified

that he interviewed the defendant, whom he identified in the courtroom. Brewer testified that he provided the defendant with the appropriate *Miranda* warnings, which he believed she understood. Thereafter, the defendant gave a statement wherein she said, "something about she was doing some stuff religiously and was being televised or something to that effect," and wherein she admitted to grabbing Cline's hands and trying to remove his rings. Brewer testified that when asked how Cline got his injuries, the defendant stated that she "assumed that maybe her fingernails" scratched Cline and caused the injuries.

¶ 18    Brewer authenticated People's Exhibit 7, and he testified that it was a DVD of footage from his interview with the defendant, which he had reviewed, and which "truly and accurately depict[ed]" the interview. The exhibit was admitted into evidence without objection and was published to the jury. Of relevance to this appeal, the approximately three-minute video exhibit showed that after Brewer asked the defendant if she grabbed Cline's hands and would not let go, the defendant nodded and answered, "I did." After Brewer asked the defendant if she tried to take Cline's rings off Cline's hands, the defendant again nodded and answered, "I did." After Brewer asked the defendant if her fingernails caused Cline's cuts, she showed her fingernails to Brewer and answered, "I guess so." The defendant did not answer when Brewer asked her why she refused to let go of Cline after Cline asked her to. When Brewer asked the defendant if she knew how old Cline was, she answered, "86." She again declined to explain why she did what she did, but she insisted that she was not trying to harm Cline. Shortly thereafter, the defendant asked to end the interview.

¶ 19    Following Brewer's testimony, the State rested. The defendant moved for a directed verdict, which was denied. The defendant testified that on November 24, 2023, she lived with the Clines, and that she "was just doing praise and worship[,] just dancing around to [her] Christian

8

music" when something on the TV in the living room "caught [her] eye." She testified that Cline "flew off the couch and got into [her] face and told [her] to cut that shit out, S-H-I-T out." She testified that Cline "was up in [her] face," and that Cline "smelled like booze." The defendant testified that Cline "went outside to the front lawn," and that she saw him "standing out there smacking his arms." She testified that thereafter, Cline "took his rings off and threw them down on the ground." She added, "Lo and behold, the next thing I know I'm being arrested. Period. That's all that happened." The defendant testified that she did not ever grab, kick, or punch Cline, and that she was "not a violent person." She testified that she was "a practicing Christian woman" and had been since she "was seven years old."

¶ 20    On cross-examination, the defendant stated that she did not remember being interviewed by Brewer, but she conceded that she had seen the DVD recording of the interview and understood that it was her in the interview. She reiterated her opinion that Cline "smelled like booze" when they interacted on November 24, 2023, and conceded that although she stated that she could not remember the interview with Brewer, she could remember "every little fact" about Cline that day. When asked about the admissions she made in the interview with Brewer, she again stated that she did not remember the interview and did not know Brewer. She conceded that she knew Cline was over the age of 60. She testified that she did not touch Cline "at all" on November 24, 2023. She further testified that she had never seen Chandler or Carmack before seeing them in the courtroom that day. She denied that the video exhibits showed her resisting arrest.

¶ 21    Following the defendant's testimony, the defense rested. Outside the presence of the jury, the defense renewed its motion for a directed verdict, which the trial court again denied. The jury returned verdicts of guilty for all three counts with which the defendant was charged. On September 3, 2024, the defendant filed a motion in which she requested a judgment

9

notwithstanding the verdict, or a new trial, on the grounds that she was not proven guilty beyond a reasonable doubt. The motion was denied. The defendant was sentenced to 24 months of probation, with the sentencing order noting that the domestic battery count merged with the aggravated battery count for sentencing purposes. This timely appeal followed.

¶ 22                                II. ANALYSIS

¶ 23    On appeal, appointed counsel for the defendant filed a motion to withdraw, on the grounds that this appeal lacks merit. See *Anders*, 386 U.S. 738. As noted above, the defendant did not file a response to the motion. In the memorandum of law that accompanied appointed counsel's motion, appointed counsel raised two potential issues for appeal: (1) whether the trial court properly found that the defendant was fit to stand trial, or, in the alternative, whether the defendant's trial counsel was ineffective for failing to ensure that a court reporter was present at, and a record was created of, the defendant's fitness hearing; and (2) whether the defendant was proven guilty beyond a reasonable doubt.

¶ 24    With regard to the first potential issue, appointed counsel noted in his memorandum of law that the Illinois Supreme Court has held—in the context of a determination of restoration to fitness to stand trial following an initial finding of unfitness—that although stipulations to an expert's opinion testimony can be proper, stipulations to the ultimate conclusion of fitness are not proper. See *People v. Lewis*, 103 Ill. 2d 111, 113-16 (1984). Counsel further noted that in a case subsequent to *Lewis*, our colleagues in the Second District held—this time in the context of an initial finding of unfitness—that "[w]here a trial court fails to conduct an independent inquiry into a defendant's fitness but, instead, relies exclusively on the parties' stipulation to a psychological report finding the defendant fit, the defendant's due process rights are violated," whereas if the "trial court's finding of fitness is based not only on stipulations but also on its observations of the defendant and

10

a review of a psychological report, the defendant's due process rights are not offended." *People v. Cook*, 2014 IL App (2d) 130545, ¶15.

¶ 25  We agree with appointed counsel that because no transcript exists of the July 24, 2024, hearing, it is not possible to determine if the trial court relied only upon the stipulation, or based its finding in part on the court's own observations of, or interactions with, the defendant, including at the July 24, 2024, hearing, and/or at a prior proceeding in this case on June 20, 2024. We also agree with appointed counsel that this court must presume that the trial court knows and follows the law unless the record demonstrates otherwise. See, *e.g.*, *People v. Jordan*, 218 Ill. 2d 255, 269 (2006). Here, the record does not demonstrate otherwise. Accordingly, we find no error.

¶ 26  With regard to the alternative first potential issue—whether the defendant's trial counsel was ineffective for failing to ensure that a court reporter was present at, and a record was created of, the defendant's fitness hearing—we agree with appointed counsel that to prevail on this issue, the defendant would have to demonstrate both that trial counsel's performance fell below an objective standard of reasonableness, and that it resulted in prejudice to the defendant. See, *e.g.*, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate prejudice, the defendant would have to show that there is a reasonable probability that, but for trial counsel's errors, the result of the proceeding would have been different. See, *e.g.*, *People v. Johnson*, 2021 IL 126291, ¶ 52. Here, as explained above, in the absence of a transcript of the hearing or a bystander's report, the defendant cannot show that the trial court did not comply with the law when making its finding on the defendant's fitness to stand trial. Therefore, the defendant cannot show that had trial counsel ensured a reporter was present and a transcript was taken, the result of the proceedings would have been different. Accordingly, the defendant cannot demonstrate prejudice, and this potential issue has no merit, even if we assume, *arguendo*, that trial counsel's performance fell below an objective

11

standard of reasonableness. With regard to the second potential issue—whether the defendant was proven guilty beyond a reasonable doubt—we have recounted above the evidence adduced at the defendant's jury trial. When reviewing a claim that a defendant was not proven guilty beyond a reasonable doubt, we view the evidence in the light most favorable to the State, and ask if, from that evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See, *e.g.*, *People v. Jackson*, 2020 IL 124112, ¶ 64. In this case, there was overwhelming evidence that the defendant committed the charged offenses.

¶ 27    Appointed counsel noted in his memorandum of law that, at first blush, it might appear that a meritorious argument could be made that the defendant did not resist Chandler, because Chandler did not tell the defendant that she was under arrest when he began to try to cuff her. However, as appointed counsel pointed out, a direct statement that a person is under arrest is not necessary to create the knowledge that the person is being arrested. See, *e.g.*, *People v. McKinney*, 62 Ill. App. 3d 61, 67 (1978) (although intent to arrest must be communicated, and defendant's understanding of that intent is a factor the court must consider, the test is not what defendant thought, but what a reasonable person, innocent of any crime, would have thought under the circumstances). As appointed counsel conceded, in this case, the video exhibits clearly showed that the defendant was aware that she was being taken into custody. All of the officers in the exhibits were in standard uniforms that identified them as law enforcement officers. When Chandler asked the defendant if there was something going on in the residence, the defendant did not answer. Chandler then asked, "Why are we here?" The defendant answered, "You know why you are here." Chandler then said, "Okay," and asked the defendant to turn around and put her hands behind her back. Although she initially complied with Chandler, she thereafter began to resist, claiming that she had "to pee," and continuing to struggle until other officers assisted Chandler in cuffing her. Under these

12

circumstances, we agree with appointed counsel that a reasonable person, innocent of any crime, would have understood that they were being placed under arrest. Accordingly, we agree that no meritorious argument could be made that the defendant was not proven guilty beyond a reasonable doubt of resisting a peace officer.

¶ 28                              III. CONCLUSION

¶ 29    An examination of the entire record makes clear that this appeal does not present any issues of arguable merit. Therefore, the motion of appointed counsel to withdraw is granted, and the judgment of the circuit court of St. Clair County is affirmed.


¶ 30    Motion granted; judgment affirmed.