2026 IL App (1st) 241266-U
Order filed: May 6, 2026

FIRST DISTRICT
THIRD DIVISION

No. 1-24-1266

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 23 CR 6181 |
| | ) | |
| HAVEN FULLER, | ) | Honorable |
| | ) | Michael B. McHale, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Martin and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's conviction for unlawful possession of a weapon by a felon is affirmed, where defendant failed to show that he was provided ineffective assistance of counsel.

¶ 2   Following a bench trial, defendant-appellant, Haven Fuller, was found guilty of unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a)) (West 2022)) and sentenced to four years' imprisonment. On direct appeal, defendant argues that his trial counsel was ineffective for eliciting testimony, during cross-examination, that defendant engaged in other bad acts and had previously used the same firearm to threaten the complaining witness. We affirm.

¶ 3     In 2023, defendant was charged with being an armed habitual criminal (AHC) (720 ILCS 5/24-1.7(a) (West 2022)), unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)), and two counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1) (West 2022)) arising out of a May 11, 2023 confrontation with the complaining witness, Watasia Bond. The State nol-prossed the AHC and AUUW counts.

¶ 4     On March 12, 2024, this case proceeded to a bench trial on one count of unlawful use or possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2022)). At trial, three witnesses testified for the State: Bond; Bond's son, T.T.; and Chicago Police Officer Juan Moreno.

¶ 5     Bond testified that she lived in a two-flat building located at 5636 South Sangamon (residence) on the second floor (second-floor unit), with her three children, including T.T. Bond's sister lived in the unit on the first floor (first-floor unit). On May 11, 2023, Bond was at home with her three children and her friend, Charles. Around 4:15 p.m., Bond was in her room when T.T. came to tell her that defendant was knocking on a window of the second-floor unit. Defendant had previously dated Bond, but they separated in 2022. Bond went to the kitchen where the back door was located and saw defendant, wearing a black jacket, standing on the balcony. T.T. was present and they were later joined by Charles.

¶ 6     Bond and defendant had a conversation on the back porch. During the conversation, defendant was "acting pretty strange." He kept putting his hand in his right pocket and raising his jacket pocket. The State then made the following request to the court: "May the record reflect that *** Bond has put her hand in her right pocket and then lifted the pocket up." The court replied "Yes, it will." In response to defendant's actions, Bond asked him if he had a firearm in his pocket. Defendant responded with a "blank expression on his face." T.T. addressed defendant and stated, "I know you're not clutching on a female." Defendant responded by arguing with T.T. and told

him to mind his own business. T.T. then left. The interaction between Bond and defendant lasted approximately 10 to 15 minutes and ended when police officers arrived.

¶ 7        When the officers arrived, defendant pulled a firearm out of his right pocket, tried to push his way into the second-floor unit, and said "please *** I don't want to go to jail." Defendant tried to give the firearm to Charles but then handed it to Bond. Bond described the firearm as "black, and it had a clear clip with a black bottom under the clip." The officers instructed defendant to walk down the back staircase with his arms raised. Defendant complied with the officers' orders and went downstairs to the backyard.

¶ 8        Within "seconds" of defendant walking down the back staircase, Bond walked downstairs to the first-floor unit to give the firearm to the officer. Bond's sister, T.T., a nephew, and an officer were present. Bond handed the firearm to the officer, and the officer removed a bullet from the chamber and "took the clip from out the gun."

¶ 9        At the end of direct examination, the following colloquy occurred between the State and Bond:

> "Q. The firearm that you gave the police officers, had you ever seen it before that day?
>
> A. Yes.
>
> Q. And where had you previously seen it?
>
> A. [Defendant] had it.
>
> Q. Okay. So you've previously seen [defendant] in possession of that same firearm?
>
> A. Yes."

¶ 10       On cross-examination, defense counsel asked Bond a series of questions relating to interactions she had with defendant prior to May 11. On April 13, defendant showed up at the residence, headbutted Bond, and threatened to "shoot up" the residence. He then ran away with

her phone. The police were involved, but defendant was not apprehended. Later that night, defendant returned and threatened Bond's sister. Defense counsel then asked Bond if she had contact with defendant in January, to which Bond responded yes. The State objected based on relevance; defense counsel responded that this line of questioning went toward Bond's bias. The court overruled the State's objection. Bond explained that, in January 2023, defendant showed up at the residence trying to fight her. In March, defendant and Bond "got into it". Defendant called Bond via FaceTime and threatened to shoot her with the same firearm that he had on May 11. Then on May 10, defendant confronted Bond at her grandmother's house and threatened to "crush [her] nose" with a picture frame.

¶ 11   On redirect examination, Bond testified that, after defendant walked down the back staircase, she walked down the internal staircase to the first-floor unit. She identified a photograph of the firearm that she gave to the officer; that photograph was entered into evidence without objection.

¶ 12   T.T. testified that, on May 11, 2023, at 4:15 p.m., he was cooking in the kitchen of the second-floor unit, when he heard a knock. He looked outside and saw defendant, who he knew as Bond's ex-boyfriend. He went to Bond's room and informed her that defendant was outside. Bond then went to the back door, which was located in the kitchen, and started arguing with defendant. T.T. remained in the kitchen and Charles eventually joined Bond at the back door. T.T. saw defendant reaching into the right pocket of his jacket, "clutching a gun with a clear clip in it." T.T. then clarified that he did not see a firearm but observed a clear clip with a black bottom. Thereafter, T.T. and defendant exchanged words and defendant told him to stay out of it. T.T. went downstairs to the first-floor unit, where he called the police.

¶ 13    The police arrived five or six minutes later and interviewed T.T. in the kitchen of the first-floor unit. Bond's sister, T.T.'s cousin, and friend were present. At some point, Bond walked into the apartment with a firearm behind her back and turned around slowly. The officer took the firearm and asked T.T. if that was the firearm he had described. T.T. responded in the affirmative and further described it as "[i]t was a clear clip, and the bottom of the gun was black."

¶ 14    T.T. previously saw defendant in possession of the same firearm. On May 10, 2023, T.T. walked by defendant and Bond, who were arguing in a garage, just off an alley. Bond told T.T. to go "into the gate," and when he did, defendant ran up behind him with the firearm. T.T. identified the firearm, in a previously admitted photograph, as the firearm that Bond gave to the officer.

¶ 15    On cross-examination, T.T. testified that the police were not called for the May 10 incident. T.T. had several negative interactions with defendant over the prior year but he had never called the police. During the May 11 incident, T.T. did not see defendant give Bond a firearm.

¶ 16    Moreno testified that, on May 11, around 4:50 p.m. he and his partner were dispatched to the residence to investigate a call for "person with a gun." Moreno and his partner arrived in the rear alley of the residence and entered the backyard. They observed defendant and Bond arguing on the "third floor balcony." Moreno ordered defendant to show him his hands and to walk downstairs. Defendant complied and was detained at the scene.

¶ 17    Moreno spoke with several witnesses in the first-floor unit. T.T told Moreno that he called the police because defendant "threatened him and [Bond] with a firearm." T.T. described the gun as "a GLOCK with a clear extended magazine." During this conversation, Bond "came downstairs in the hallway on the first floor" looking "very nervous, shaking, wide-eyed, and sweating." Bond had one hand behind her back and stated that she had a firearm. Moreno recovered the firearm, "a GLOCK 26 with a clear extended magazine" from her and "cleared" it. Moreno identified a

previously admitted photograph as the firearm that he "cleared." Moreno also identified a video, played by the State without sound, as a recording from his body worn camera (BWC). In the video, Moreno can be seen interacting with witnesses for more than five minutes before Moreno enters the first-floor unit, walks toward the front door, and meets Bond who is standing inside holding a firearm behind her back.

¶ 18    On cross-examination, defense counsel requested that the video be played with sound. The State objected and the court overruled the State's objection. As the officers enter the backyard, a woman can be heard yelling "You're not coming in here." Moreno then draws his firearm and the officers instruct defendant to come down the stairs. Defendant complies and is searched for a weapon. Several other officers arrive on the scene and search the backyard for a weapon. No weapon is recovered. Defendant is directed to the rear alley while witnesses are questioned at the scene. Just over five minutes pass from the time that Moreno comes up to the residence to take statements to when he walks into the first-floor unit toward the front door and meets Bond who is standing with an arm behind her back holding the firearm.

¶ 19    Following Moreno's testimony, the State admitted without objection a certified copy of defendant's 2004 conviction for criminal drug conspiracy under case number 03CR2171312.

¶ 20    Both parties rested and proceeded to closing arguments.

¶ 21    Defense counsel argued that there was reasonable doubt that defendant possessed the firearm. First, when the police arrived, Bond never yelled to them that defendant had a firearm or that he had given her a firearm. Second, Bond waited about eight minutes before coming downstairs to turn over the firearm, which was inconsistent with her testimony that she walked downstairs within "seconds." Third, Moreno testified that T.T. told him that defendant threatened him with a firearm, but T.T. testified that he saw a clip, not a firearm. Lastly, the police officers

did not see defendant with a firearm and they were not promptly notified that defendant had a firearm during his interaction with Bond.

¶ 22    In response, the State argued that Bond, T.T., and Moreno testified credibly. The State noted that Bond extensively and honestly testified as to the current incident and as to previous encounters with defendant. Bond explained defendant's actions that made her believe that he had a firearm and that he eventually handed her the firearm. T.T. testified to Bond's interaction with defendant and observed the clear magazine clip sticking out of defendant's right jacket pocket. The encounter was very stressful for Bond and, although it was very difficult, she did bring the firearm to the officer. The State noted that, based on the BWC, at some point while the officers were collecting information and searching the backyard, Bond walked downstairs and entered the first-floor apartment. Further, the State argued that it was apparent from the BWC that Bond was scared and timid but was doing the right thing by giving the firearm to the officer.

¶ 23    The trial court found defendant guilty of unlawful use of a weapon by a felon. The trial court found Bond, T.T., and Moreno credible. The trial court then noted that it was left with trial counsel's argument that Bond's delay showed reasonable doubt. The trial court rejected this argument where the delay in Bond bringing the firearm to the police officers was not unreasonable under the circumstances. The court reasoned that Bond "probably had a million things going through her mind" and the situation was "extremely stressful." The trial court found that the BWC corroborated this reasoning; Bond looked "absolutely terrified and totally stressed out."

¶ 24    The trial court explained that the foregoing reasoning was enough for a finding of guilty, but further analyzed Bond's testimony as to her prior interactions with defendant. Specifically, the court stated:

"But she did testify to detailed numbers of domestic instances between her and the defendant, which I think I'm allowed to consider. Even assuming that I'm not considering them, there is still enough here for a finding of guilty.

There is a whole history of him threatening her and using a gun on her. FaceTiming her and showing her the same exact gun. So I think I'm allowed to consider that as well. Even without it, it is still a guilty. It is also very powerful testimony."

¶ 25    The trial court sentenced defendant to four years' imprisonment. Defendant appealed.

¶ 26    On appeal, defendant argues that he received ineffective assistance of counsel where his trial counsel elicited testimony, during cross-examination, that defendant engaged in other bad acts and had previously used a firearm to threaten Bond, the complaining witness. The State argues that defense counsel made a strategic decision to establish Bond's bias through this testimony and defendant was not prejudiced, where, even without trial counsel's cross-examination, defendant would have been found guilty.

¶ 27    Every defendant has a constitutional right to the effective assistance of counsel. *People v. Domagala*, 2013 IL 113688, ¶ 36. Ineffectiveness of counsel claims are judged using the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Peterson*, 2017 IL 120331, ¶ 79. Under *Strickland*, the defendant must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011) (citing *Strickland*, 466 U.S. at 688, 694). "The performance and prejudice components of an ineffective assistance inquiry present mixed questions of law and fact. However, our standard of review for determining whether a defendant's sixth amendment right to the effective assistance of counsel was denied is ultimately *de novo*." *People v. Lewis*, 2022 IL

126705, ¶ 48 (citing *People v. Johnson*, 2021 IL 126291, ¶ 52; *People v. Hale*, 2013 IL 113140, ¶ 15).

¶ 28 The defendant's failure to establish either prong of the *Strickland* test precludes a finding that counsel was ineffective. *People v. Henderson*, 2013 IL 114040, ¶ 11. If a claim may be resolved on the basis that there is no prejudice, a reviewing court need not consider if counsel's performance was deficient. *People v. Gaciarz*, 2017 IL App (2d) 161102, ¶ 50. Here, we need not consider whether trial counsel's decisions on cross-examination amounted to deficient representation, where defendant has not established the prejudice prong of the *Strickland* test.

¶ 29 To establish prejudice, a defendant must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *People v. Cherry*, 2016 IL 118728, ¶ 24. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. *Strickland* requires a defendant to "affirmatively prove" that prejudice resulted from counsel's errors. *Id.* at 693.

¶ 30 Here, to sustain the charge of unlawful possession of a weapon by a felon, the State was required to show that defendant knowingly possessed a firearm on or about his person while having been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2024). Defendant's appeal revolves around the element of whether he knowingly possessed a firearm.

¶ 31 As to this element, the State presented the testimony of three witnesses and the evidence at trial came down to the credibility of those witnesses. Bond testified that, during an altercation at her home with defendant, she suspected that defendant had a firearm when she noticed that he kept putting his hand inside of and raising his right jacket pocket. That was the same pocket that T.T. testified that he saw a clear clip with a black bottom. Bond further testified that defendant eventually pulled out a firearm, which had a clear clip, and handed it to her. This was the same

firearm that she turned over to Moreno in the first-floor unit. Moreno testified that the firearm had a clear clip. Further, on direct examination, Bond and T.T. testified that they had previously seen defendant in possession of the firearm; T.T. further explained that defendant had threatened him with the same firearm the day before.

¶ 32    In ruling, the trial court, who observed the witnesses testify, found that Bond and T.T. were credible and not "impeached in any way" and that their testimony was corroborated by the testimony of Moreno and the BWC. The trial court further found that this evidence was enough to find defendant guilty. See *People v. Smith*, 185 Ill. 2d 532, 541 (1999) ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict.")

¶ 33    The testimony provided by the State, on direct examination, established that, on May 11, defendant was in possession of a firearm during his altercation with Bond at the back door of the second-floor unit. The testimony of Bond and T.T. were corroborated by the testimony of Moreno and the BWC. Had trial counsel not elicited the testimony about the prior interactions between defendant, Bond, and T.T. it is not probable that the result would have been different. Therefore, defendant has failed to affirmatively prove that prejudice resulted from counsel's actions.

¶ 34    Defendant argues that his trial counsel's cross-examination of Bond and T.T., which elicited evidence of prior negative interactions with defendant and that defendant had previously threatened Bond and T.T. with the same firearm, prejudiced defendant in that, but for this line of questioning, the trial court "may have come to a different conclusion." Defendant points to the trial court's statement during its oral ruling that the cross-examination testimony as to these prior interactions was "very powerful." Defendant further argues that Bond's testimony, as to when she walked downstairs to meet the officer, was inconsistent with the timing on the BWC. We disagree.

¶ 35    In a bench trial, the trial court, as the trier of fact, is responsible for determining the credibility of the witnesses, weighing the evidence, resolving conflicts in the evidence, and drawing reasonable inferences therefrom. *People v. Siguenz-Brito*, 235 Ill. 2d 213, 228 (2009). While the rules of admissibility of evidence are the same whether a trial occurs with or without a jury, in a bench trial, the trial court is the trier of fact and "a trial judge is presumed to know the law and only consider competent and admissible evidence." *People v. Williams*, 246 Ill. App. 3d 1025 (1993). "This presumption may only be rebutted where the record affirmatively establishes that the trial judge in fact considered inadmissible evidence." *Id.* at 1033.

¶ 36    Here, as discussed above, the trial court found Bond credible, even after considering defendant's argument that her testimony was inconsistent with the BWC footage. From the BWC footage, over five minutes pass before Bond is seen handing over the firearm to the officer. However, the BWC footage does not show Bond walking down the internal staircase. It only shows her standing and waiting inside of the first-floor unit when the officer walks through the front door. Her testimony that she walked down the stairs within "seconds" of defendant walking down the back staircase is not inconsistent with the BWC as it does not show when she actually walked down the stairs. Further, Bond, as corroborated by the BWC, was scared and nervous, which would explain any timing inconsistency of a few minutes instead of seconds.

¶ 37    Additionally, even if we agree with defendant that the trial court's comment, "It is also very powerful testimony," related directly to the cross-examination testimony, we still find that defendant was not prejudiced. The trial court made it clear that even without this testimony, the trial court would still have found defendant guilty, where it specifically stated that "[e]ven without it, it is still a guilty." Therefore, defendant has not overcome the strong presumption that, in a

bench trial, the court considers only admissible evidence and has not shown that there was a reasonable probability that the trial judge, as the finder of fact, would have acquitted defendant.

¶ 38    Defendant cites *People v. Orta*, 361 Ill. App. 3d 342 (2005) and *People v. Bailey*, 374 Ill. App. 3d 608 (2007). In *Orta*, the defendant was charged with possession of a controlled substance with intent to deliver. *Orta*, 361 Ill. App. 3d at 344-45. On cross-examination, defense counsel elicited evidence that the defendant had prerecorded funds in his possession on a previous day that he received after selling drugs to a police informant, allowing the State to establish that defendant was a drug dealer. *Id.* 344-45, 47. On appeal, this court found that the evidence of the prerecorded funds prejudiced the defendant where this evidence played a role in the trial court's finding of intent to deliver, a critical element in the State's case. *Id.* In *Bailey*, the defendant was also charged with possession of a controlled substance with intent to deliver. 374 Ill. App. 3d at 613. On cross-examination, defense counsel elicited the only testimony that linked defendant to an unknown person on the corner yelling "rocks" indicating that there were drugs for sale. *Id.* at 614-15. On appeal, this court found that this testimony proved an element of the offense that the State had not otherwise established and the defendant was prejudiced by the admission of the evidence. *Id.*

¶ 39    Here, unlike in *Orta* and *Bailey*, the State provided evidence on each element of the charged offense to find defendant guilty and trial counsel's line of questioning did not prove an element of the charged offense. Further, it is clear from the record that the trial court did not rely on the information elicited from cross-examination where it specifically stated in its ruling that even without the details provided by Bond, it still would have found defendant guilty.

¶ 40    Therefore, defendant has failed to prove that prejudice resulted from counsel's errors and that he was provided ineffective assistance of counsel.

¶ 41    Affirmed.